## HUDSON v. UNITED STATES.
### No. 9283.

Circuit Court of Appeals, Eighth Circuit.
Jan. 18, 1932.

Charles T. Coleman, of Little Rock, Ark. (W. B. Sorrells, of Pine Bluff, Ark., and Walter G. Riddick, of Little Rock, Ark., on the brief), for appellant.

Wallace Townsend, U. S. Atty., of Little Rock, Ark.

Before KENYON, VAN VALKEN-BURGH, and GARDNER, Circuit Judges.

KENYON, Circuit Judge.

Appellant-defendant was convicted on two counts of an indictment each of which charged willful misapplication by him of the funds of the National Bank of Arkansas, which was operating under the Federal Reserve system. There were three other counts of the indictment upon which the jury returned a verdict of not guilty. While the record is extended, the essential facts are few, and there is little dispute in the evidence. An instructed verdict of not guilty on counts 1 and 2 being the ones upon which defendant was convicted was requested at the close of the evidence. This was denied by the court, and the main assignment of error is in reference to this action. There are other assignments relating to the introduction of evidence and the refusal to permit certain evidence to be introduced, which, in view of our conclusion on the main assignment, are of minor importance.

We refer first to the evidence as to count 1. Defendant was president of the National Bank of Arkansas at Pine Bluff, Ark., which bank was a member bank of the Federal Reserve Bank of St. Louis. He had been instrumental with others in forming the Salt Bayou drainage district in Arkansas, and had been secretary and treasurer of the same since its organization. He was also one of the commissioners of said district, appointed with two others in the act creating the same. Mrs. L. K. Land was county treasurer of Jefferson county, and as such treasurer she received from the tax collector the taxes from a number of improvement districts, including the Salt Bayou district. She deposited these funds in various banks, one of which was the National Bank of Arkansas. Defendant being evidently hard pressed by creditors secured from Mrs. Land a check on said bank for $12,500 payable to the National Bank of Arkansas, which represented funds of the Bayou district. This check was delivered by her to D. C. Young, assistant cashier of said bank. On this check she wrote in the corner, "Sault Bayou Drainage Dist." He receipted for the same as such assistant cashier. This receipt had upon it the words, "Sault Bayou Drain. Dist." Mr. Young took the check to the bank and laid it on defendant's desk in the bank's office, defendant not being there at the time. This check was never deposited by defendant. He used the same to pay for a draft drawn on the Hanover National Bank for $12,500,

payable to the Franklin-American Trust Company of St. Louis, which company eventually received the draft and secured the money thereon in payment of a personal debt owing by defendant to said trust company. The amount of this check was charged against the account of the county treasurer, Mrs. Land, upon the books of the bank. Defendant claimed that he had an arrangement with the district by which he could borrow district funds up to $60,000, and testified that on the same day he received the check he gave a note to the district for $12,500 indorsed by his wife, who was amply protected by life insurance to take care of his various notes given to the district in case of his death. These notes are in evidence. They were kept by him in a file in the bank marked, "W. C. Hudson, private," the envelope being indorsed, "Salt Bayou."

The evidence as to count 2 is this: In August, 1929, Mrs. Land, as county treasurer, delivered to defendant her check for $15,512.27, payable to the Salt Bayou drainage district. This was deposited by defendant in the Cotton Belt Bank & Trust Company. At his request there was issued back to him a cashier's check for $8,900 payable to the National Bank of Arkansas. This he deposited to his individual credit in said bank and checked thereon for personal matters. The account in the Cotton Belt Bank & Trust Company was carried in the name of the "Salt Bayou Drainage District, W. C. Hudson, Treasurer."

The statute under which this indictment was brought, USCA, title 12, § 592 (R. S. § 5209, as amended by Act of September 26, 1918, § 7), provides: "Any officer, director, agent, or employee of any Federal reserve bank, or of any member bank as defined in sections 221 to 225 of this title, who embezzles, abstracts, or willfully misapplies any of the moneys, funds, or credits of such Federal reserve bank or member bank," etc.

It has been held by this court that misapplication of bank funds under section 5209, Revised Statutes, is not established unless it appear that the bank funds have been depleted by the action of the accused. In Dow et al. v. United States, 82 F. 904, 906 (this court) the meaning of the term "misapplication" as used in section 5209, Revised Statutes, was discussed. The court referred to United States v. Britton, 107 U. S. 655, 2 S. Ct. 512, 27 L. Ed. 520, and United States v. Northway, 120 U. S. 327, 7 S. Ct. 580, 30 L. Ed. 664, where the construction of said section 5209 of the Revised Statutes was involved, and held in line with these cases that there must be a conversion of funds to the use of the defendant with intent to injure and defraud the bank, and that misapplication was not made unless the funds of the bank had been depleted. The court said: "To complete a misapplication of the funds of the bank, it was necessary that some portion thereof should be withdrawn from the possession or control of the bank, or a conversion in some form should be made thereof, so that the bank would be deprived of the benefit thereof. It is not necessary in all cases that the money should be actually withdrawn from the bank."

In United States v. Martindale, 146 F. 280, 282, referring to the same section, Judge Philips in the District Court said: "It has been expressly ruled by the Court of Appeals of this circuit that to complete the misapplication of the funds of a bank it is necessary that the fund should be withdrawn from the possession or control of the bank, or a conversion thereof in some form should occur, so that the bank loses the same."

See, also, Batchelor v. United States, 156 U. S. 426, 15 S. Ct. 446, 39 L. Ed. 478.

In Bishop v. United States (C. C. A.) 16 F.(2d) 410, in a case arising under the same statute as the present case, this court held the misapplication of funds must be with a willful and felonious intent to injure or defraud the bank to constitute a crime thereunder. It is difficult to see just how the funds of the bank were depleted by the transaction set forth in count 1 of the indictment. Defendant delivered to the bank in payment for the draft on the Hanover National Bank the check for $12,500 drawn by Mrs. Land, a depositor. It was charged to her account. The bank's liability to said depositor was lessened by the same amount its reserve was reduced by the payment of the draft on the Hanover National Bank.

The testimony of Mr. Schneider, an accountant of the Bureau of Investigation of the Department of Justice, is interesting on this phase of the case. We quote therefrom as follows:

"By Mr. Sorrells:

"Q. That amount of $12,500.00 on that was charged to her account on that day, wasn't it, Mr. Schneider? A. Yes, it was.

"Q. In the course of your investigation did you understand that twelve thousand five hundred dollar check of Mrs. Land's was that used to purchase that exchange on the Hanover National Bank of New York? A. Yes, it was.

"Q. Then her account having been charged with that $12,500.00, The National Bank of Arkansas liability was reduced or diminished to that extent, wasn't it? A. Their liability to Mrs. Land was diminished $12,500.00.

"Q. So the bank lost nothing by that transaction? A. The bank's asset account in the Hanover National Bank was also reduced—

"Q. That would be even-Steven? A. Yes, I may say—

"Q. That check of Mrs. Land's was a good check? A. Yes, it was.

"Q. And he used that, as you understand it, to purchase this exchange on the Hanover National Bank? A. Yes, that is true."

The books of the bank showed according to Mr. Schneider that the check of $12,500 of Mrs. Land was used to purchase the exchange on the Hanover National Bank, and he further testified:

"Q. So that for the Hanover draft, as it appears upon the books, there was value received paid for that draft, unless the question should arise as to the validity of her check? In other words, the check of $12,500.00 was just the same as that, or if you carried in that much cash? A. Oh, yes; if I understand your question.

"Q. At the time that the draft of the Hanover National Bank, payable to the Franklin-American Trust Company of St. Louis was issued, then it was paid for, wasn't it? A. Yes, it was.

"Q. With real money, or the same thing as money? A. Yes, sir."

█ It is fundamental of course that the funds claimed to be misapplied were funds of the bank. Counsel for the government claims in his argument that the jury found that the money with the misapplication of which defendant was charged was the money of the bank and not of the Salt Bayou district. Of course it must have so found to have convicted on either count.

█ Did the $12,500 check ever become a part of the funds or credits of the bank? While the check from Mrs. Land was payable to the bank, there can be no question under the evidence that the transaction was intended by her and by defendant to be a turning over by her to defendant, who was treasurer of the Salt Bayou district, of certain funds of the district which he had a right as treasurer to receive. Whether he used them for proper purposes did not concern the drawer of the check. That is a ques-

tion between defendant and the district. Mrs. Land testified that she knew Mr. Young was assistant cashier and that Mr. Hudson was president of the National Bank of Arkansas. This check was delivered to Young for defendant. Mrs. Land testified:

"Recross-Examination.

"I knew Mr. Hudson was acting in a dual capacity, as treasurer of the drainage district and official of the bank. I delivered the check to Mr. Young for the Salt Bayou Drainage District to go to Mr. Hudson.

"Q. You knew that was Mr. Hudson? A. Yes, sir."

Mr. Young was asked if he went to Mrs. Land's office and got some money for the Salt Bayou drainage district or got a check from her on that date. He testified that he gave her the receipt, which was in evidence, for the check, and that he returned to the National Bank of Arkansas and delivered the check to Mr. Hudson by placing it on his desk. He was not delivering it to Hudson in his capacity as president of the bank, but as treasurer of the district.

The Salt Bayou drainage district had a regular account with the bank. There was no credit to the account of such district for the amount of the check at that time. Mrs. Land wrote in the corner of the check, "Sault Bayou Drain. Dist." The receipt given by Mr. Young while signed as assistant cashier has upon it the words "Bayou Dist."

Appellee insists that all the elements of a deposit exist in this transaction and that the situation is the same as if the check had been formally deposited. The rule as to a complete deposit is laid down in 7 Corpus Juris, § 318: "A deposit is complete when the money passes from the possession of the depositor into the possession of an agent of the bank, within the bank, and during banking hours."

We are unable to agree that the circumstances show a deposit of the check. It is apparent that Mrs. Land intended to deliver certain of the funds of the district to its treasurer, as she was probably obligated to do. Had the check been made to him as treasurer of the district, it is not probable there would have been a count 1 as at present in the indictment. The circumstance the government principally relies on as to this count is the fact that the check was issued to the bank. Does that change the situation? Suppose defendant had destroyed this check, could the bank have complained? Would they have lost anything? Surely not. It had not become a part of its assets, was not

given for its benefit, and did not represent any of its funds. If Young had deposited the check, what would the bank have done with it? The county treasurer had not given it to pay any indebtedness due the bank. There is nothing in the record to show any such indebtedness. To whom would the bank credit the check? Upon inquiry it would have found out it belonged to the district and probably would have credited it there. Suppose Mrs. Land had delivered cash to Mr. Young to give defendant as treasurer of the drainage district and he had left the same on Hudson's desk, could it be reasonably claimed that the cash became funds of the bank? If defendant had taken it out and used it for the district, could the bank complain? Mr. Young left the check on defendant's desk. If it was in fact a check for the bank to be deposited to the credit of the bank, the natural inquiry arises: Why did Mr. Young not deposit the same, why turn it over to Hudson? If it was for Hudson as treasurer of the Salt Bayou district, as claimed by defendant, then Young did the natural thing to leave it on Hudson's desk. Why was the check sent to defendant at all if it was for the bank? In these transactions it is apparent Hudson was acting as treasurer of the district and not as president of the bank. Undoubtedly, as treasurer of the district, he could have drawn the district's money from the bank and then had he wrongfully used it in payment of private debts he would have been answerable to the district. It would have been an offense undoubtedly against the district, unless he had the authority which he claimed to borrow from the district, but not an offense against the bank under the statute upon which this indictment is based. We think the fact that the check was drawn to the bank under the circumstances here shown is not controlling on the question of whether the funds represented by the check ever became a part of the bank's funds.

As to count 2, the evidence shows we think practically the same situation exists as to count 1. Defendant received from the county treasurer, Mrs. Land, a check on the Cotton Belt Bank & Trust Company for $15,512.27, payable to Salt Bayou drainage district. He indorsed this check, "Salt Bayou Drainage District W. C. Hudson." Out of this check he deposited $6,612.27 to the credit of the drainage district in the Cotton Belt Bank and took from said bank a cashier's check for $8,900, which he deposited in the Arkansas National Bank and checked thereon to pay his own personal

matters. He requested this check to be made to the Arkansas National Bank. Defendant claimed he had a right to borrow the money from the district under an agreement he claims to have made with the district. He placed in the safety deposit box in which he kept the district's papers a note of the exact amount, $8,900, indorsed by his wife, Nellie B. Hudson. This money he deposited in the Arkansas National Bank to his personal account, which was credited therewith. We are unable to see how the bank lost anything by this transaction or had its funds depleted in any way. As between the bank and Hudson it was Hudson's money. It was no concern of the bank how he acquired the money, and he merely checked out what he had put in. That what he put in was borrowed or appropriated from the drainage district money did not make it bank funds. Mr. Hogg, vice president of the Cotton Belt Bank & Trust Company, on cross examination testified as follows:

"Q. He was carrying the account as treasurer of the Salt Bayou Drainage District; is that right? A. Yes, sir.

"Q. You issued your cashier's check as treasurer of the Salt Bayou Drainage District? A. Issued to the National Bank of Arkansas.

"Q. That is the way it is payable, but you delivered it to him as treasurer of the Salt Bayou Drainage District; that is right, isn't it? A. Yes, sir.

"Q. Did Mr. Hudson request you to make it payable to The National Bank of Arkansas? A. Yes, sir."

It seems clear to us that a verdict should have been directed for defendant on count 2.

We are unable to find any case where the facts are similar to those here. We refer to some cases in this circuit where the question of whether money wrongfully appropriated belonged to the bank. In Wherrell v. United States (C. C. A.) 18 F.(2d) 532, the defendant was collection teller of a member bank of the Federal Reserve system. Checks were sent to the bank for collection. One check drawn on a bank in Kansas to the order of defendant was indorsed by defendant and the proceeds were by him appropriated to his own use and benefit. It was held that the checks when collected became funds of the bank, and that the defendant was guilty of a violation of section 5209 of the Revised Statutes. In Spencer v. United States (C. C. A.) 169 F. 562, it was held that the money which was appropriated by the defendant which he had col-

lected as agent of the bank belonged to the bank before it was actually deposited. In Matters v. United States, 261 F. 826, this court held that the issuing by an officer of a national bank, without consideration of certificates of deposit which were afterwards paid by the bank, constituted a misapplication of its moneys, funds, and credits, within Rev. St. § 5209, and that the intent with which the act was done was a question for the jury. These cases furnish little assistance in the solution of the question here as the facts are entirely different.

■■ Much is said in argument as to some arrangement having been made with the defendant by the board of commissioners of the Salt Bayou district to lend him district funds up to $60,000. The court charged the jury fully as to this and evidently the jury did not believe that any such arrangement had been made. We do not understand how the undisputed evidence on this subject could have been passed by. The credibility of the witnesses is, of course, for the jury, but there is much evidence to show that some arrangement had been made for defendant to borrow from the district. Whether such arrangement would be lawful may be doubtful, but it is apparent that defendant believed he had the right to borrow from the district and that he had made some kind of arrangement so to do. The other two commissioners are dead. No minutes were kept for years of the commission's proceedings, and hence nothing of record appears as to any such authority. Defendant, however, was corroborated by the testimony of Miss Lessie Dodd that some arrangement had been made. He covered all these transactions by notes given to the district and indorsed by his wife. Two of such notes bear the O. K. of one of the commissioners. Defendant testified that one of the commissioners was unwilling he should borrow funds unless he presented a financial statement that would show him entitled to the credit. He testified he presented this statement to the commissioners showing a net worth of $384,057.20, and that he carried life insurance aggregating $180,000, of which $108,000 was payable to his wife. The court instructed the jury as to this as follows: "If you find from the testimony that the defendant was authorized by the board of directors of the Salt Bayou Drainage District to draw the moneys of that district left on deposit with the bank and use the same for his own benefit to the extent of the amount drawn or used by him, or if you find from the course of dealings in good faith between the defendant and the said board of directors that the defendant had a reasonable cause to believe, and in good faith did believe, that he was so authorized, then he is not guilty of the crime charged in counts one and two of the indictment. In determining whether the directors of the drainage district and the defendant acted in good faith, you will take into consideration all the facts and circumstances introduced as evidence in the case."

We think this financial statement offered in evidence should have been admitted and that it was most prejudicial to the defendant not to admit it. It entered into the negotiations defendant claims were carried on with the district commissioners and bore on the good faith of the transaction, which question of good faith the court stressed in its instructions. Defendant was entitled to have this statement before the jury. The question on authority of defendant to borrow is so close that we feel the case would have to be reversed on this ground, if no other; but in the view we take that the funds defendant is accused of misapplying never became the funds of the bank, we feel it our duty to reverse the case on that ground instead of on the question of the admissibility of the evidence. While defendant undoubtedly had authority as treasurer to draw funds from the drainage district, if he did not have authority to borrow, as the jury evidently found, then he misapplied the funds of the district. For that he is not on trial under this indictment and he cannot be convicted here for a crime not charged in the indictment. The indictment charged him in both counts with misapplication of funds entirely different from what the government sought to prove. The judgment of conviction on both counts is reversed, and the case remanded for further proceedings in harmony with this opinion.

Reversed and remanded.