## KRAMER v. UNITED STATES.

### No. 6236.

United States Court of Appeals
Fourth Circuit.

Argued June 27, 1951.

Decided July 25, 1951.

O. Bowie Duckett and Wilson K. Barnes, Baltimore, Md. (G. C. A. Anderson and Anderson & Barnes all of Baltimore, Md., on brief), for appellant.

Bernard J. Flynn, U. S. Atty., Baltimore, Md., for appellee.

Before SOPER and DOBIE, Circuit Judges, and T I M M E R M A N, District Judge.

SOPER, Circuit Judge.

Andrew A. Kramer, who for many years had been an officer and finally President of the Annapolis Banking and Trust Company of Annapolis, Maryland, a member bank of the Federal Reserve Bank of Richmond, Virginia, was convicted in the District Court of causing a false entry to be made in the books of his Bank and of misapplying certain funds and securities of the Bank in violation of 12 U.S.C.A. § 592. The judgment of the court was that he be imprisoned for a period of five months, and this appeal ensued.

The indictment was in three counts of which the first charged that the defendant on November 19, 1947 wrongfully and fraudulently caused to be entered in the Bank Recovery Committee Ledger the figure of $1380 which purported to show a principal balance due on a mortgage owing by Frank W. Dixon whereas, as the defendant knew, the mortgage had been paid in full. The following recital states the substance of the facts relating to this transaction: On September 30, 1929 Dixon executed a promissory note for $3,000 payable to the Bank and secured by mortgage on his home property in Anne Arundel County, Maryland. On May 11, 1933 the Bank assigned the note and mortgage to the Annapolis Mortgage Company, a corporation wholly owned by the Bank, which was organized during the bank holiday of 1933 to hold all of the doubtful assets of the Bank and to facilitate its reopening. Both the mortgage and the assignment thereof were duly recorded among the land records of the county. Certain transactions between the Mortgage Company and the Reconstruction Finance Corporation then took place which involved a loan from the Corporation, the assignment to the Corporation of the Dixon mortgage and other assets, and the subsequent reassignment of these items to the Mortgage Company on July 23, 1935. There they remained until December, 1941 when it was deemed advisable that the Mortgage Company reassign the doubtful notes to the Bank and that an earnest effort be made to collect them. Accordingly on December 19, 1941 the directors of the Mortgage Company, acting under the advice of the Bank's attorney, authorized its officers to offer its notes for sale to the Bank subject to the approval of the Bank Commissioner at a price to be determined by a joint appraisal committee. The Bank accepted the offer and agreed to purchase the "charge off and doubtful" notes. The appraisal committee was appointed and the price of $25,000 for the assets was fixed and accepted by the Mortgage Company. No formal assignment of the Dixon Mortgage was executed or recorded.

In October, 1947 examiners of the Federal Reserve System, which the Bank had joined in 1943 or 1944, made an examination of the Bank and filed with it a report wherein they recommended that the charged off assets of the Bank be periodically examined by the directors. The report showed that the Dixon mortgage could not be located but that the examiners had been informed by the attorney of the Bank that there was an unpaid balance due thereon of $1350, and that no interest had been paid thereon since January 29, 1936 and no payment on the principal since 1944. After the report was received it was determined to enter this asset on the "charge off ledger" of the Bank, and this was done by the Bank's Vice President. This entry, which forms the basis of the first count of the indictment, showed an indebtedness by Dixon to the Bank of $1350. The amount was taken from the note itself which was in the possession of the Bank; and it was carried on the Bank Recovery Committee Ledger in the same way as the rest of the assets which were transferred by the Mortgage Company back to the Bank in 1941. These items were examined and checked from time to time by the Bank Recovery Committee, of which the defendant and the Vice President of the Bank were members. At these meetings the Dixon item was discussed and it was assigned to the defendant for collection and he reported that he would endeavor to collect it. In 1949, no report of the collection of the item having been made to the Bank, it was assigned to another member of the Committee for collection. Dixon was then asked for payment and told the representa-

tive of the Bank that he had paid the balance due to an officer of the Bank whom he later identified as Kramer.

Dixon testified at the trial in the District Court that in January, 1946 he applied to the defendant, who was an old acquaintance, for another loan from the Bank on another piece of real estate in the county which he desired to purchase for $12,000, and that he told the defendant that he was prepared to pay his old loan which, with interest, then amounted to approximately $2500, and also to pay $5,000 on account of the purchase price of the new property. Later the defendant notified Dixon that the Bank would accept the new mortgage and in March, 1946 Dixon gave Kramer two checks payable to cash, one for $2500 to cover the indebtedness on the old mortgage, and one for $5,000 to be applied to the purchase price of the new property. The statements of his bank account, which Dixon subsequently received from the Bank, showed that his account had been charged with these sums but the two checks were never returned to him and the defendant told him that the checks had probably been lost. When Dixon asked the defendant for a return of the first mortgage he was put off. Kramer in fact used both checks for his private purposes. Later, on June 19, 1946, he caused $5,000 to be deposited to Dixon's credit at the Bank, and the second mortgage transaction was put through; but the defendant did not pay the $2500 to the Bank. It was in 1947, after these transactions had taken place, that the Recovery Committee undertook the examination of the charge off items upon the recommendation of the bank examiner as above described and the false entry was made upon the Committee's ledger.

The defendant testified at the trial that Dixon had loaned him the two sums of $5,000 and $2500 above mentioned, but Dixon said that he did not lend the defendant the $2500 check but delivered it in payment of his first mortgage. Dixon paid the balance due on this mortgage a second time on December 12, 1949 and the defendant reimbursed him for this expenditure at or about the same time. A release of the mortgage, which still stood in the name of the Mortgage Company, was then executed by the Mortgage Company and placed on the land records of the county. Efforts were made by Kramer to secure a written statement from Dixon to the effect that Dixon had loaned Kramer the $2500 in 1946, and certain papers were signed, but Dixon testified that the transaction took place as above set out, and his account was obviously accepted by the jury.

 It is contended that the actions of the defendant above described did not constitute a false entry in the books of a member bank in violation of 12 U.S.C.A. § 592, because the note and the mortgage did not belong to the Bank but to the Mortgage Company, which was not a member of the Federal Reserve System, as defined in Sections 221 to 225 of the statute. It is pointed out that under the Maryland statutes and decisions, the record holder of a mortgage has the legal title to the property, and that the title to all notes secured by mortgage is conclusively presumed to be vested in the person holding record title to the mortgage; and if the mortgage is released of record the notes are conclusively presumed to be paid so far as any lien upon the property is concerned. Maryland Annotated Code, Art. 66, § 26. Williams v. Safe Deposit & Trust Co., 167 Md. 499, 175 A. 331; Whitelock v. Whitelock, 156 Md. 115, 143 A. 712; Dickey v. Pocomoke City Nat. Bank, 89 Md. 280, 43 A. 33. Hence it is said that in the eye of the law the Dixon note as well as the Dixon mortgage remained the property of the Mortgage Company and the first count of the indictment cannot be sustained because the false entry contemplated by the statute is one which is not only made on the books of a member bank but is made with intent to defraud a member bank, and there can be no such intent when the entry relates to an asset which belongs to another corporation. It has been decided that the misapplication or misrepresentation of funds by an officer of a bank at which the statute is directed relates to funds or assets of the bank in order to constitute an offense. United States v. Britton, 107 U.S. 655, 2 S.Ct. 512, 27 L.Ed. 520; Hudson v. United States, 8 Cir., 55 F.2d 591; and it is con-

tended, that in like manner a false entry does not fall within the scope of the statute unless it relates to an asset of the bank.

 The fact is, however, that the Bank had a substantial property interest in the indebtedness represented by the mortgage. Not only did the Bank have possession of the note, as the result of the transfer back of the doubtful assets from the Mortgage Company to the Bank, but the Mortgage Company had been paid the agreed consideration for the transfer and was clearly under an obligation to take such steps as might become necessary to perfect the Bank's technical legal title to the assets in question. Such a step did not become necessary since the Mortgage Company was completely owned and controlled by the Bank, and at the latter's instance executed the formal release of the mortgage when the debt was paid to the Bank in December, 1949. We have therefore no need to discuss the technical aspects of the situation under the Maryland law, for it is plain that the entry related to an enforceable legal right held by the Bank. Since the entry was false to the knowledge of the defendant, the case under the first count was made out. Accordingly there was no error, as the defendant contends, in the instruction of the court to the jury wherein they were told that if they should find that the defendant received the money from Dixon, but withheld it from the Bank, the entry was false and the Bank was defrauded, even though they should find that the legal title to the mortgage was in the Mortgage Company and not in the Bank, and even though the debt was ultimately paid and the Bank lost nothing. See Bishop v. United States, 8 Cir., 16 F.2d 410.

 Nor was there error in submitting to the jury the question whether the defendant was responsible for the entry although the evidence showed that the entry was actually made by a Vice President of the Bank and not by the defendant. That which the defendant did was to withhold the information from the officers of the Bank that the debt had been paid, and the result was that the balance believed to be due was entered in the ordinary course of business upon the Recovery Committee's ledger together with other items. The case is similar to United States v. Giles, 300 U. S. 41, 57 S.Ct. 340, 81 L.Ed. 493, where it was held that a bank teller who withheld deposit slips in order to conceal a shortage, with the result that the ledger understated the amount of the bank's liability to the depositors, was guilty of making a false entry in violation of the statute. The court held that it was the evident intent of Congress to include within the fair meaning of the statute the deliberate action of an official of the bank from which a false entry by an innocent employee necessarily followed. See also Morse v. United States, 2 Cir., 174 F. 539; Peters v. United States, 9 Cir., 94 F. 127.

It may be added, moreover, that the defendant does not contend that the entry was not made to his knowledge in the ordinary course of business as the result of the sale of doubtful assets from the Mortgage Company to the Bank. His defense was that Dixon had not paid the debt and therefore the entry was true. Hence it is unnecessary to consider the further contention of the defendant that the judge went too far in his charge in saying that the offense of making a false entry is made out, if the defendant intentionally aids in continuing or carrying an entry in the books, knowing it to be false.

 There was no error in submitting to the jury the bank examiner's report of October, 1947 in respect to the Dixon mortgage, although the examiner was not called as a witness. That such a report was made by the examiner and read by the defendant was admitted, and it served to explain how the entry, known by the defendant to be false, came to be entered on the Recovery Ledger.

The second count of the indictment, based on 12 U.S.C.A. § 592, charged that Kramer on February 27, 1948, with intent to injure and defraud the Bank, unlawfully and wilfully misapplied securities entrusted to the custody and care of the Bank, that is, 43 shares of the stock of the Bank represented by a certificate issued in his name, in that he endorsed the certificate in blank and sold and delivered it to Thomas W. Davis; and when Davis delivered

the certificate to the Bank with instructions to transfer it to Ruth P. and Thomas W. Davis, Kramer caused the certificate to be cancelled and in lieu thereof caused two certificates to be issued in his own name, that is, one certificate for 18 shares and one certificate for 25 shares.

The issue of fact which arose upon this charge was whether Kramer sold the certificate of stock to Davis, or delivered it to Davis as security for a loan of $430. Davis testified that he bought the stock for $430 in 1937 or 1939, received the endorsed certificate and put it in his safe and later in 1944 took it to the Bank to be changed to the names of himself and his wife; but in spite of a number of requests to the Assistant Treasurer of the Bank and to Kramer, he never got the new certificate. This testimony was corroborated. A new certificate was actually prepared according to Davis' instructions but Kramer failed to sign it, saying that he had given the stock as security for his note which had never been returned to him. Subsequently, on February 27, 1948, Kramer delivered the certificate of 43 shares in his name to the transfer clerk for cancellation and caused the clerk to issue the two certificates in his name as above described. Kramer testified that he did not sell the stock to Davis but delivered the certificate to Davis as security for a loan; but the conviction on the second count indicates that the jury accepted the testimony of Davis. After the investigation into Kramer's conduct at the Bank began, he and Davis made an agreement of settlement which included the transaction above described, as well as other business transactions between them.

The defendant contends that there should have been an acquittal on this count because on February 27, 1948, when the misapplication of the Bank stock took place, it was not an offense under the statute, 12 U.S.C.A. § 592, as it then existed, for an officer of a bank to misapply securities entrusted to its custody or care. The statute provided in effect that any officer of a bank who wilfully misapplied any of the monies, funds or credits of the bank, with intent to defraud the bank, should be guilty of misdemeanor, and upon conviction, fined or imprisoned or both. The statute also explicitly provided that any Federal Reserve agent, who wilfully misapplied any funds or securities entrusted to his care, should be guilty of a misdemeanor and punished accordingly; but the statute did not expressly provide that an officer of the bank who misapplied funds or securities entrusted to his care, or to the care or custody of the bank, should be guilty of a crime.

The Act of June 25, 1948, 62 Stat. 729, separated the former statute, 12 U.S.C.A. § 592, into three sections, which are codified as Sections 334, 656 and 1005 of Title 18 of the Criminal Code. Section 334 relates to the issuance and circulation of Federal Reserve notes and Section 1005 relates to false entries and the wrongful issue of certain bank obligations. Section 656 makes it a crime for any officer of a member Bank to embezzle, abstract, purloin or wilfully misapply "any of the moneys, funds or credits of such bank or any moneys, funds, assets or securities intrusted to the custody or care of such bank, or to the custody or care of any such agent, officer, * * *." It is explained in the Reviser's Note under Section 656 that the purpose of the change was to clarify and condense the original Section 592 of Title 12 without changing in any way the meaning or substance of the pre-existing law. The defendant, however, contends that the misapplication by Kramer of Davis' certificate of stock was not a misapplication of monies, funds or credits of the Bank since the stock was not an asset of the Bank and that the second count cannot be saved by considering the Davis certificate an asset or security entrusted to the custody or care of the Bank because the clause of the amended statute, which made such an asset or security a subject of criminal misapplication by an officer of a bank, was not a part of the statute at the time that the offense charged in the indictment was committed.

The answer to this contention is found in a series of decisions under the old statute which support the Reviser's statement that the amendment did not change the meaning of the pre-existing law. These decisions held that where se-

curities or funds of a customer of a bank were entrusted by him to its custody and were wrongfully used by an officer of the bank contrary to the customer's instructions, a misapplication of the "monies, funds and credits" of the bank in violation of the old statute took place because, as between the bank and its officer, the assets were the property of the bank which had acquired them for a specific purpose from the owner and therefore had the title of a fiduciary lawfully in possession. See Bishop v. United States, 8 Cir., 16 F.2d 406, 408; United States v. Harter, 7 Cir., 116 F.2d 51, 54; United States v. Jenks, D.C.E.D.Pa., 264 F. 697. In like manner the Bank in the pending case had a special property in the Davis certificate which had been entrusted to it for the purpose of transferring the stock to Davis and his wife, and the wrongful misuse of the certificate by Kramer for his own benefit constituted a misapplication of an asset of the Bank.

The third count of the indictment charges that the defendant on April 25, 1949, with intent to defraud the Bank, embezzled and misapplied monies, funds and credits of the Bank in the sum of $500 by wrongfully misapplying the proceeds of a check for $500 given to him in partial payment of certain judgments held by the Bank against F. W. Weems in that the defendant did not credit the money to the judgments but used the money for his own purposes. This transaction relates to one of the doubtful assets of the Bank which was transferred to the Mortgage Company in the same way as the Dixon mortgage. Certain judgments against Weems were transferred in this manner and were covered by the transaction whereby the charged off assets were transferred back to the Bank in 1941. In May, 1947 Weems desired to sell certain real estate upon which the judgments constituted a lien and he agreed to pay to the Bank the sum of $500 to release the lien of the judgments in respect to the property to be sold. Kramer accepted the proposition on behalf of the Bank and received a check for $500. This check, however, for some reason was not deposited or cashed. Two years later the defendant se-

cured another check as a duplicate. He used it to purchase a cashier's check payable to one J. G. Zindorf, a friend of long standing. He secured Zindorf's endorsement upon the cashier's check, cashed it at the Bank and retained the proceeds. Kramer contended that Zindorf had purchased the Weems judgment from the Bank, and when the sum of $500 was paid thereon, loaned the money to Kramer, but Zindorf denied this statement and the jury evidently accepted his version of the matter.

The defense to this count of the indictment is similar to that which is made to the first count which related to the Dixon mortgage. It is pointed out that the Weems judgment, like the Dixon mortgage, was assigned by the Bank to the Mortgage Company and that it was never formally reassigned to the Bank either by a separate assignment or by an order entering the judgment to the use of the Bank on the records of the court. On the contrary, the judgment was assigned to Zindorf. Reference is made to the Maryland law in regard to the assignment of judgments to the effect that it may be done either by a separate deed of assignment or by an order entered upon the docket of the court.

The answer to this argument is the same as that under the first count. The debt represented by the judgment was included among the assets which the Mortgage Company agreed to transfer back to the Bank. If the judgment had remained in the name of the Mortgage Company, it would have been held by that company for the interest of the Bank and its formal transfer could have been secured at any time. Consequently the Bank had a substantial interest in the judgment and when it was paid to the extent of $500, and this sum was misappropriated by the defendant, there resulted an embezzlement or misapplication of funds within the meaning of the statute. If the judgment was improperly assigned to Zindorf, who had no interest in it, in order to conceal the transaction, the embezzlement nevertheless took place and the defendant was properly convicted under the third count of the indictment.

█ It is urged that the defendant's motion for a general verdict of acquittal

should have been granted because the Bank's assets were not depleted by the transactions covered by the three counts of the indictment and because it was not proved that the defendant had an intent to defraud the Bank in the performance of the actions described. It is obvious that neither contention is tenable. There was a depletion of the Bank's assets in each instance when Kramer used them for his own purposes, and the subsequent restitution constitutes no defense. Norton v. United States, 8 Cir., 205 F. 593; Savitt v. United States, 3 Cir., 59 F.2d 541; Duvall v. United States, 3 Cir., 94 F.2d 911. The existence of the intent to defraud at the time the acts were done is fairly inferable from their detrimental effect upon the Bank and this intent was not rebutted by subsequent restitution. Mulloney v. United States, 1 Cir., 79 F.2d 566; Robinson v. United States, 6 Cir., 30 F.2d 25.

Certain objections are raised as to rulings of the court on questions of evidence during the trial, but they involve matters of minor importance which were not prejudicial to the defendant even if they were technically inaccurate.