361 F.2d 31
 George F. GLACY, Defendant, Appellant,
v.
UNITED STATES of America, Appellee.
Daniel A. BENSON, Defendant, Appellant,
v.
UNITED STATES of America, Appellee.
Henry MERSEY et al., Defendants, Appellants,
v.
UNITED STATES of America, Appellee.
Patrick B. McGINNIS, Defendant, Appellant,
v.
UNITED STATES of America, Appellee.
 Nos. 6652, 6653, 6662, 6666.
 United States Court of Appeals First Circuit.
 Heard May 3, 1966.
Decided May 25, 1966.
 
 Edward O. Proctor, Boston, Mass., for George F. Glacy, appellant.
 Claude B. Cross, Boston, Mass., with whom John M. Reed and Withington, Cross, Park & McCann, Boston, Mass., were on brief, for Daniel A. Benson, appellant.
 Edward F. Myers, Boston, Mass., with whom Cornelius J. Sullivan and Holtz, Sullivan & Zonderman, Boston, Mass., were on brief, for Henry Mersey and others, appellants.
 William T. Griffin, New York City, with whom Lawrence R. Cohen and Newton H. Levee, Boston, Mass., were on brief, for Patrick B. McGinnis, appellant.
 John H. Dougherty, Atty., Dept. of Justice, with whom Donald F. Turner, Asst. Atty. Gen., W. Arthur Garrity, Jr., U.S. Atty., and Howard E. Shapiro and Richard A. Wegman, Attys., Dept. of Justice, were on brief, for appellee.
 Before ALDRICH, Chief Judge, and McENTEE and COFFIN, Circuit Judges.
 ALDRICH, Chief Judge.
 
 
 1
 The defendants, McGinnis, Glacy, and Benson, president, vice-president in charge of finance and accounting, and vice-president in charge of operations, respectively, of the Boston & Maine Railroad, were convicted of misapplying[1] assets of the railroad. Defendants Mersey and International Railway Equipment Corporation, hereinafter collectively, Mersey,[2] were convicted of aiding and abetting. We will deal with the evidence later at more length. Briefly, the government showed that defendant officers presented to the railroad's board of directors a proposal to sell ten stainless steel passenger cars for $250,000, an unreasonably low price, and obtained approval by false statements of what similar cars were selling for; that they caused the cars to be sold for that price to Mersey, the railroad receiving payment only after Mersey had sold to another road which was already committed to buy for $425,000; that Mersey thereafter paid the defendant officers, individually and respectively, $35,000, $25,000 and $11,500, or a total of $71,500, much of which was actual proceeds of the sale.[3] All defendants moved unsuccessfully for a dismissal of Count 2 of the indictment, the one on which they were convicted,[4] and for directed verdicts of acquittal for joint and, in most instances, individual reasons. The appeals raise certain further issues.
 
 
 2
 A basic matter, which defendants presented in various manners,[5] is a supposed distinction between misapplying the cars and misapplying the proceeds. We are unimpressed, as was the district court, whose analysis of the issue and exposition to the jury was a model of simplicity and clarity.
 
 
 3
 The offense charged was the improper sale at a known inadequate price,[6] to a fraudulent middleman,[7] with defendants' intended acquisition and retention of the proceeds, all part of the one grand design. The statute is not restricted to technical embezzlement, but embraces the broader concept of misapplication. Cf. Batchelor v. United States, 1895,156 U.S. 426, 15 S.Ct. 446, 39 L.Ed. 478; United States v. Mulloney, D.Mass., 1934, 8 F.Supp. 674, aff'd, 79 F.2d 566, cert. den. 296 U.S. 658, 56 S.Ct. 383, 80 L.Ed. 468; Kramer v. United States, 4 Cir., 1951, 190 F.2d 712, 717-718. The defendant officers committed one underlying offense, violative of the statute, whether their action is sought to be broken down as depriving the railroad of the cars for less than they were worth, to their individual advantage, or as pocketing proceeds which, in law, belonged to the railroad.[8]
 
 
 4
 The indictment fully sets out the statutory offense and the basic facts charged, so that neither the grand jury nor the defendants were misled. Count 2 of the indictment charges one offense, and the evidence abundantly supports it, unless there was some error as to its admission.
 
 
 5
 The defendants duly objected to the court's instruction to the jury, near the end of the government's case, that it was warranted in considering all the evidence against all the defendants. This raises the question whether sufficient concert among them was independently shown. Lee Dip v. United States, 9 Cir., 1937, 92 F.2d 802, cert. den. 303 U.S. 638, 58 S.Ct. 526, 82 L.Ed. 1099; United States v. Olweiss, 2 Cir., 1943, 138 F.2d 798, cert. den. 321 U.S. 744, 64 S.Ct. 483, 88 L.Ed. 1047.
 
 
 6
 Evidence introduced by the government and independently admissible, disclosed the following. In 1957, prior to the sale of the ten passenger cars, the railroad had sold two stainless steel dining cars to Bugbee, a Texas dealer in used railway equipment. Throughout this prior transaction the railroad acted through its employee, Bolton, who was the one regularly in charge of such matters. Bugbee resold the cars to the Wabash Railroad. All of these facts were known to all of the officer defendants. On April 30, 1958[9] Bugbee saw Bolton in Boston and indicated an interest in the passenger cars. Bolton replied that they were in use and not for sale. However, on request, he took Bugbee to Glacy. Bugbee inquired if he could have an option to purchase the cars for $500,000. Glacy refused. On April 29 Glacy had received from Benson, the defendant officer in charge of such matters, a current list of equipment available for sale. These cars were not on it. We now recite, under each defendant's name, evidence admissible at least against the stated defendant.
 
 Mersey
 
 7
 Mersey's files contained a copy of Benson's 'for-sale' list, dated, in Mersey's handwriting, April 30. On it was written in Mersey's handwriting, 'add ten stainless cars,' with a notation that Mersey was requesting prints. On May 10, after calling several times previously, Mersey reached Bugbee on the telephone, introduced himself, said he 'owned' the ten cars, and offered to split with Bugbee whatever the latter could realize above $500,000. On June 25 Mersey telephoned Bugbee and reported that McGinnis had complained to Mersey that Wabash had tried to deal directly with McGinnis. Mersey stated that he had the situation in hand, and that he had told McGinnis so. Bugbee reported, in the same conversation, that Wabash would not pay more than $500,000. On July 17 Bugbee informed Mersey that Wabash's top price was $425,000.
 
 
 8
 The sale was voted on July 23, and consummated August 14. Between August 13 and December 16, Mersey made payments to the defendant officers totalling $71,500.
 
 Glacy
 
 9
 Glacy, in early June, informed Bolton that the sale of the ten cars would not be handled by Bolton, but by Mersey. Bolton objected that it was his job, and raised Bugbee's prior interest. Glacy told Bolton that McGinnis wanted it handled this way. On June 26, the day after Bugbee had told Mersey that Wabash's top price was $500,000, Glacy stated in an office memorandum seeking Benson's pricing of the cars, that similar cars had been bought from the New York Central by Seaboard Airline for $20,000 to $22,000 after it had been 'practically ready to buy these coaches from us.' In fact Seaboard had not been practically ready, had bought nothing from New York Central, and had bought cars, the nature of which did not appear, from the C & O for $84,000. On July 18, the day after Bugbee had told Mersey that Wabash's top figure was $425,000, Glacy informed Benson by office memorandum that he had an offer of $250,000, and requested Benson's approval. When the sale was consummated Glacy, upon releasing the cars, accepted a personal check post-dated by eight days. It was customary to require a certified check. The personal check exposed the railroad to serious risk. Mersey was already indebted to the railroad in the amount of $75,000 for a longer time than it was customary to permit, and had a bank balance of only $30,000.
 
 
 10
 Glacy received and collected payments on two checks, $12,500 each, drawn by Mersey on August 22 and 29.
 
 Benson
 
 11
 Benson took Mersey to Bangor on April 30, the railroad paying the air fare. Since no railroad reason for Mersey's trip has been suggested, this indicates, at the least, some intimacy between Benson and Mersey. Benson's retained office copy of his 'for-sale' list had a note attached stating that prints of the ten cars had been given Mersey on May 1. Benson, whose duties related to the sale and purchase of equipment, and who could be expected to be knowledgable, in giving Glacy a price of $30,000 on June 30, accepted Glacy's gross misstatement of the New York Central price. When Glacy, by subsequent memorandum, asked approval of $25,000 a car, Benson replied affirmatively, stating the cars were going to require heavy overhaul, at a cost of $25,000 apiece.
 
 
 12
 Benson received and collected payment on three checks drawn by Mersey on August 13, October 9, and December 16, for $5,000, $1,500, and $5,000, respectively.
 
 McGinnis
 
 13
 It was McGinnis' custom, as president, to review the agenda for the directors meeting beforehand. The memorandum presented to the July 23 meeting requesting a vote on the sale of the ten cars did not name the buyer. Nor did it name the railroad officials who were endorsing the sale, but merely stated that it was recommended by 'management.' These lacunae were both contrary to standard practice. The sale was unanimously voted. In January 1962, McGinnis told an ICC investigator that he had been the one to present the sale to the directors. On the stand he denied this. Glacy and Benson were not directors, and if McGinnis had not sponsored the sale it does not appear who did.
 
 
 14
 McGinnis received and collected payment on three checks drawn by Mersey-- two on October 10, each for $10,000, and one on December 3, for $15,000.
 
 
 15
 Each officer defendant took the stand and admitted, and sought to explain, receipt of the payments charged to him. Benson testified that his payments were for information and advice allegedly given Mersey in connection with other property Mersey had considered buying from the railroad. In making this explanation Benson, at the least, implicated himself as sufficiently intimate with Mersey to sell him information in clear breach of his fiduciary obligations to his employer.
 
 
 16
 Glacy testified that his two checks represented two years' salary for consulting services rendered to Mersey. The checks, ostensibly a week apart, were actually contiguous in the checkbook. On Glacy's testimony they represented a payment of the first year's salary nearly eight months later, and of the second year's salary four months prior to the end of the year. Furthermore, Glacy had previously received from Mersey appropriate compensation for the first year's salary, assuming it was earned at all. As against Glacy's testimony, in January 1962 he had told an ICC inspector that he had never received payments of any description from Mersey or his company.
 
 
 17
 McGinnis testified that his payments from Mersey had been for services in connection with a transaction referred to as the Schiavone loan. The loan never went through. In January 1962 McGinnis told an ICC inspector that he had never received any payments from Mersey or his company, and specifically, that he had not received $35,000, and that although he had worked on the Schiavone loan, it had not materialized and he had received no fee. There were additional inconsistencies of record in McGinnis' courtroom explanations.
 
 
 18
 Mersey did not take the stand. His company records showed the various payments, but inconsistently with some of the defendant officers' testimony.
 
 
 19
 In sum, it could properly be found that each of the defendant officers consciously acted to facilitate the improper sale of the cars. Among other things, Glacy grossly misstated the circumstances of supposedly similar cars being brought by the Seaboard Airline; Benson, within whose expertise such matters lay, acquiesced in his statement, and in the price at which the Boston & Maine cars were ultimately sold; and McGinnis presented the matter of the sale to the board of directors in a significantly unorthodox manner. Even if there were merit in the defendant officers' contention that there was no direct evidence that any of them conspired with each other, a contention which leaves a number of matters unanswered, there was clear evidence that each conspired with Mersey. It was far too much of a coincidence, when events interlocked in the manner set forth, for the district court not to have been able to find that there was one conspiracy embracing all the defendants, rather than three isolated bilateral agreements. The court's ruling was amply supported.
 
 
 20
 Only one further matter merits mention. Some of the testimony damaging to the defendants came from Bugbee, whose accounts of his telephone conversations with Mersey were reinforced by introduction of transcripts of recordings made by Bugbee without the knowledge, and hence consent, of Mersey. Defendants say that the transcripts are rendered inadmissible because their divulgence would violate 47 U.S.C. 605, the arguably pertinent portion of which reads,
 
 
 21
 'No person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communications to any person * * *.'
 
 
 22
 We agree with the reasoning of the court in Carnes v. United States, 5 Cir., 1961, 295 F.2d 598, cert. den. 369 U.S. 861, 82 S.Ct. 949, 8 L.Ed.2d 19, holding the transcripts admissible. This result accords not only with the decision of the court in Rathbun v. United States, 1957, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134, but, we believe, with the minority opinion as well.
 
 
 23
 Affirmed.
 
 
 
 [1]
 'Embezzles, steals, abstracts, or willfully misapplies, or willfully permits to be misapplied, any of the moneys, funds, credits, securities, property, or assets * * * or willfully or knowingly converts the same to his own use or to the use of another * * *.' 18 U.S.C. 660
 
 
 [2]
 Mersey was the principal officer and representative, as well as sole stockholder of International
 
 
 [3]
 The fact that the proceeds could be specifically traced becomes relevant in a later matter, but does not enter into our decision that the offense was made out
 
 
 [4]
 Count 1, after having gone to the Supreme Court, United States v. Boston & Maine R.R., 1965, 380 U.S. 157, 85 S.Ct. 868, 13 L.Ed.2d 728, was dismissed during trial
 
 
 [5]
 The defendants' attacks on the indictment, demands for particulars, motions for acquittal and a number of their refused requests for instructions, directly or indirectly raised this issue
 
 
 [6]
 It is this aspect of the case that distinguishes it from the state decisions cited by the defendants. We agree that the agents there entrusted to sell property, whether potatoes, watermelons, bonds, stock, automobiles, or spreaders, could not be convicted of conversion of the proceeds on a charge of converting the property. In those cases the sales were fully authorized. In the case at bar if defendants' only misconduct had been to intercept and pocket proceeds of an honest sale, the present indictment would have been inappropriate. But that is not this case. The defendants were charged with a larger offense. The district court's instruction laid this issue on the line
 'If what these defendants did was bad judgment in selling the cars at the price for which they sold them, or was stupidity and nothing more, then they are not responsible. They have a wide degree of latitude in the exercise of their judgment. But willfulness means that they intended to do what they did, and did it voluntarily, and with a specific intent, or bad purpose, the bad purpose being to line their own pockets at the expense of the Boston and Maine.'
 The statement, made in oral argument by one of the defendants, that the 'court put to the jury that the only question was whether the defendants converted the money,' if the charge is taken as a whole is simply not so.
 
 
 [7]
 Mersey, because he took title, objects to being described as a middleman. It is clear on the government's evidence, however, that the cars passed through him as part of the original scheme, in order to siphon off what rightly should have gone to the railroad
 
 
 [8]
 For this latter reason cases such as Heath v. United States, 9 Cir., 1954, 209 F.2d 318, and Golden v. United States, 1 Cir., 1963, 318 F.2d 357, are inapposite. In Heath it conclusively appeared that the property had ceased to be government property before it was converted. In Golden the question was whether the property misapplied by the defendant had been delivered to him in his capacity as officer of the bank, or as a fiduciary for another
 
 
 [9]
 Unless otherwise noted, all dates refer to 1958