COMMONWEALTH *vs.* ERWIN SOROKO.

Suffolk.    October 2, 1967. — November 8, 1967.

Present: WILKINS, C.J., SPALDING, CUTTER, KIRK, & SPIEGEL, JJ.

*Evidence,* Of identity, Relevancy and materiality, Hostile witness, Leading question, Judicial discretion. *Robbery. Practice, Criminal,* Argument by prosecutor.

At a trial for robbery while masked, in which a witness identified the defendant as resembling a man whom the witness had seen in a corridor near the scene of the crime shortly after it occurred, the judge did not err in refusing to strike police testimony concerning differences in general appearance between another man, whose photograph the witness had picked out before trial as one of two head and shoulders

photographs portraying the man he had seen in the corridor, and the defendant, whose photograph was the other one picked out by the witness, where the photographs showed some resemblance between the heads of the two men. [259–260]

There was no abuse of discretion on the part of the judge at a criminal trial in permitting the prosecutor to cross-examine and put leading questions to a hostile witness called by the Commonwealth who was a close friend of the defendant and who had been with him prior to and immediately after the crime. [260]

At a trial for robbery at a jewelry store from which merchandise of great value was missing after the robbery, there was no prejudice to the defendant, who had visited the store before the robbery and indicated an interest in diamonds, in permitting an employee of the store to testify that the merchandise not stolen was of slight value. [260]

At a trial for robbery at a jewelry store from which diamonds were missing after the robbery, a paper in the handwriting of a close friend of the defendant, who had been with him shortly before and immediately after the robbery and who said symbols on the paper "referred to . . . diamonds" when the paper was found in her possession, was properly admitted in evidence. [260–261]

At the trial of an indictment for robbery at a jewelry store in Boston against a man working as a cook on the day of the robbery, evidence that a woman companion who went to Hawaii with the defendant and who was with him there six days after the crime did not pay for her trip there, and of the circumstances of the trip, culminating in their return to Boston two days after their arrival in Hawaii, was properly admitted. [261–262]

Circumstantial and direct evidence at the trial of an indictment for robbery at a jewelry store while masked and armed warranted conviction of the defendant, who had visited the store four times before the robbery with various companions. [262]

There was no merit in a contention by the defendant in a criminal case that there was prejudicial error in the prosecutor's statement in argument that "in any criminal case . . . a witness should be given credit today for testifying." [262]

Two INDICTMENTS found and returned in the Superior Court on May 6, 1966.

The cases were tried before *Forte*, J.

*Joseph J. Balliro* for the defendant.

*Jack I. Zalkind*, Assistant District Attorney, for the Commonwealth.

CUTTER, J.  Soroko was indicted for robbery from Harry Cortell, on March 24, 1966, while masked and armed. He was also indicted, jointly with Charles S. Lombardi, for assault, on the same day, by means of a dangerous weapon.

Trial took place (December 13–21, 1966) subject to G. L. c. 278, §§ 33A–33G, as amended. During the trial, Lombardi entered a plea of guilty to a separate indictment for robbery and to the assault indictment. The trial proceeded against Soroko, who rested at the close of the Commonwealth's case. The jury found him guilty on both indictments. Soroko appealed. The jury could have found the facts stated below.

Harry Cortell ran an incorporated wholesale and retail jewelry business on the third floor of the building at 333 Washington Street, Boston. Sometime in January, 1966, Soroko, accompanied by another person, went to the store and negotiated with Harry Cortell for the purchase of a diamond. Diamonds, taken from a rectangular leather wallet, were shown to him then or later. Some time after the first visit, Soroko returned. Mark Cortell, son of Harry Cortell, waited upon him. Soroko never mentioned his own name, but said that the transaction was to be in the name of Richard Clutch. On the second visit Soroko was accompanied by a friend (not his companion on his first visit) who was also looking for a diamond. Soroko was planning to have a diamond mounted in a man's ring at a cost of about $1,000.

About a week later Soroko came to the store a third time with a man who had not been present on either prior occasion. The negotiations on this third occasion were for the new visitor. They decided on a diamond, at a price of $1,100, and a ring mounting, measured to fit the finger of Soroko's companion. A deposit of $200 was then paid. At this time Soroko had what appeared to be an untrimmed moustache just being grown.

Thereafter by telephone an appointment was made for very early in the morning the day following the call. Inquiry was made about what time the store opened in the morning. Soroko came in the next day with the same companion. At the trial, the latter was identified as one Joseph Balliro, then said to be connected with Intermission Lounge, where Soroko was employed as a cook on March 24, 1966. They picked up the ring, paid for it, and departed.

During one of the visits Soroko showed Mark Cortell several men's rings. He spoke of trading these toward the diamond he was purchasing. Mark Cortell identified as one of these rings a ring which was later taken by the police from the codefendant Lombardi's finger at the time of his arrest.

On the morning of March 24, 1966, Mark Cortell arrived at the store about 8:30 A.M. Four employees were already there. About 8:55 A.M. he saw a man about five feet ten inches to six feet tall (during the trial referred to as the No. 1 man) standing at the window of his office. He was wearing sun glasses, a black fedora hat, and a dark raincoat. He held a pistol. Over his face he had a scarf. Another man (the No. 2 man), similarly dressed but not as tall, also wearing sun glasses, stood nearby. Lombardi was later identified as the No. 2 man by Mark Cortell. All the occupants of the store (the two Cortells, several employees, and a customer) were herded into a separate room and forced to lie on the floor. Mark Cortell heard the "deep raspy voice" of the No. 1 man, which "sounded very similar to . . . Soroko's voice."[1] Lombardi, after two or three minutes, asked Mark Cortell where "the diamond trays were," and threatened "to pistol whip" him, if he did not tell him. The intruders found what they wanted and left. Before leaving, they told the occupants to remain on the floor "for five minutes after they left, because somebody is watching the door." After the intruders had gone, merchandise worth over $100,000 was missing.

Shortly after 9 A.M. on March 24, Eli Indenbaum, a wholesale diamond merchant, entered the rear entrance to 333 Washington Street and went to the third floor. He saw two men coming toward him. Both were walking rapidly and were wearing dark raincoats. One wore sun glasses and had a moustache. Indenbaum continued on to Cortell's store, where he saw several men rising from the floor.

[1] On cross-examination Mark Cortell conceded that, at first after the robbery, he and his father had concluded that they did not know either intruder.

About three weeks after the robbery, Indenbaum was shown "[a] few dozen" photographs by the police. He selected heads and shoulders photographs of three men. One photograph was of Soroko, one was of Lombardi, and a third was of a man named Spinelli, who according to police testimony was much heavier and looked older than Soroko. Two of these pictures, Indenbaum thought, resembled the men he had met in the corridor. At the trial Indenbaum identified the defendants as resembling the men in the corridor. Soroko appeared to him to be the one who had the moustache. Indenbaum admitted that he was not certain that the defendants were the men he had seen, but "[t]hey could be."

John Adams, a salesman for the Cortell store, saw Soroko in the store a week before the robbery. He identified Lombardi in court as the No. 2 robber and had picked out a picture of Soroko when interviewed by the police.

A young divorced woman (Mrs. Ciulla) knew both Soroko and Lombardi. She had met Soroko two years prior to the robbery in a meat market where he had been employed, where she had worked, and where she had seen Lombardi. She, one Barbara Saltzman (Lombardi's "girl friend"), Lombardi, and Soroko had been in each other's company, at least once at a downtown lounge and once in a motel suite. She and Soroko on March 30, 1966, were together in Hawaii with Joseph Balliro (who had bought the ring from Cortell's) and a girl named Jo Ann. Just before Mrs. Ciulla went to Hawaii Barbara Saltzman called her to find out whether she "or anybody in the Intermission Cafe" had seen Lombardi who "had not come home." The day after they arrived in Hawaii Soroko told her, "We are going back to Boston." He added, "[T]here is trouble in Boston." Soroko and Mrs. Ciulla returned to Boston the next day.

Mrs. Ciulla did not know who was paying the expense of the trip. The tickets were in the name of "Schwartz."

After her arrival in Boston Mrs. Ciulla did not go to her home at once. First she went to the meat market where

she had previously seen Soroko and Lombardi. She was about to go to a motel, when the police took her to Station 2. At the police station she was questioned about a small piece of paper in her handwriting found in her possession. It contained various symbols which Mrs. Ciulla, after she knew she was being interrogated about a jewelry robbery, said "referred to . . . diamonds." She interpreted the notation "2–4K pears" as referring to diamond carats and pears. She knew that carat is a measurement for diamonds. She had heard the expression "a pear-shaped stone." Among the largest size pear-shaped stones missing after the robbery were a 3.62 carat stone and a 3.47 carat stone.[2] The next largest pear-shaped stone missing was under three carats. The paper also referred to "1-Triangle." One triangle-cut diamond was missing. Jewelry not taken by the robbers was of relatively small value.

1. Soroko first contends that the trial judge improperly refused to strike police testimony concerning the differences between (a) the total appearance and description of one Spinelli whose photograph the witness Indenbaum had picked out as one of two pictures [3] portraying a person resembling a man he had seen in the corridor of 333 Washington Street on the morning of the robbery, and (b) the total appearance and description of Soroko. Indenbaum, of course, had before him, when looking at the two photographs, only head and shoulders photographs. The exhibits show that there was some resemblance between the heads of Spinelli and Soroko. We think that it was as open to the Commonwealth to attempt to prove that there was little resemblance between the two men in general stature, so that it was unlikely that one would be taken for the other, as it would have been to show that one was a cripple and the other was not, or that Spinelli was elsewhere on

[2] It is difficult to tell the weight of a diamond by its appearance. This circumstance permits the argument that, if the paper referred to diamonds, a nonexpert observer might have mistaken these two pear-shaped stones as being as large as four carats.

[3] Indenbaum picked out three pictures. One was of Lombardi, who by his plea of guilty admitted his presence at the robbery. The other two were of Soroko and Spinelli.

the day of the robbery or dead. The selection by Indenbaum of the Spinelli picture went only to the weight of his identification of Soroko and his picture as resembling the man he had seen.

2. The trial judge might in his discretion permit cross-examination of Mrs. Ciulla. She had been shown to be a close friend of Soroko who had been with him in Hawaii as well as in Boston. Although, when permission was given to the assistant district attorney to treat her as hostile, she had not been as seriously uncoöperative as she appeared to be later in her testimony, we cannot say that the trial judge who observed her conduct abused his broad discretion to permit leading questions. *Commonwealth* v. *Simpson*, 300 Mass. 45, 51, cert. den. 304 U. S. 565. *Commonwealth* v. *Sheppard*, 313 Mass. 590, 597, cert. den. 320 U. S. 213. See *Commonwealth* v. *Harrison*, 342 Mass. 279, 286.

3. The trial judge in his discretion could permit Mark Cortell to testify that the merchandise not stolen was of slight value. Although this evidence by itself was of little probative significance, it did show a circumstance of the crime (see *Commonwealth* v. *Durkin*, 257 Mass. 426, 428) and that the robbers were looking for items of value, which might shed light on other testimony; for example, Lombardi's inquiry of Cortell concerning "the diamond trays." In any event, it was not prejudicial.

4. The paper in Mrs. Ciulla's handwriting was admissible. She had been a companion of Soroko prior to the robbery. Soroko and Lombardi had been together in her presence shortly prior to the robbery. She had been to Hawaii with Soroko immediately after the robbery and thus he had full opportunity to communicate facts to her about the items taken if in fact he had been involved. The paper referred so closely to types of items missing after the robbery as to permit the inference that it referred to missing items. She gave no satisfactory explanation of this paper in her handwriting found in her possession almost immediately after her return from Hawaii. The inferences to be drawn from all

the circumstances were such as to make it proper to permit the jury to consider whether and to what extent the paper reflected information received from Soroko, the person with whom she had been associated most closely just prior to the paper's discovery. The circumstance of the discovery of the paper and of Mrs. Ciulla's somewhat meager and evasive explanation of it were in evidence. Any facts raising doubt concerning its relation to Soroko went to the weight of the evidence. See *Commonwealth* v. *Parrotta,* 316 Mass. 307, 313; *Commonwealth* v. *O'Toole,* 326 Mass. 35, 39; *Commonwealth* v. *Grant,* 352 Mass. 434, 437–438.

5. Testimony that Mrs. Ciulla did not pay for the trip to Hawaii was admissible, in view of the probability and the permissible inference that Soroko, with whom she went, did pay for the trip. There was testimony that he was working as a cook on March 24, 1966. The trial judge could reasonably view the evidence as permitting the inference of sudden affluence on the part of Soroko. See *Commonwealth* v. *Locke,* 338 Mass. 682, 691.

The Commonwealth proved that Lombardi was arrested on March 30, 1966. That day Soroko, who had just arrived in Hawaii (either that day or the day before), told Mrs. Ciulla that there was trouble in Boston and they returned. Although Mrs. Ciulla's evasive testimony concerning telephone communications from Boston to Soroko and Balliro was confused and indefinite, that and other testimony permitted the jury to infer that there had been such communications. Also, the evidence concerning Lombardi's arrest on March 30 permitted an inference that it caused the strange, sudden return from a trip to Hawaii obviously taken at substantial expense.

Although the trial judge ruled informally that the Hawaiian trip could not be regarded as an admission by flight from the scene of a crime, the circumstances of that trip had relevance, even if the trip was undertaken solely for pleasure. The evidence about the trip revealed Soroko's conduct immediately after the date of the crime, the persons (including Balliro who had paid for the ring bought from

the Cortells) with whom Soroko was then associating, and the extent and intimacy of that association, and the possibility of Soroko's access to Mrs. Ciulla's handwritten paper describing diamonds prior to its discovery. See McCormick, Evidence, § 151.

6. The trial judge properly refused to direct verdicts of not guilty. The aggregate of the evidence already summarized permitted the jury to conclude that Soroko's visits to the Cortell store were a reconnaissance for the robbery, that during the reconnaissance he had attempted to use a ring owned by Lombardi as part payment for the ring purchased by Balliro, that he had been seen by Indenbaum leaving after the robbery, and that he had been present at the robbery. The testimony concerning the association of Soroko, Lombardi, and Balliro, during the period of the robbery and the visits of Soroko and Balliro to the Cortell store could reasonably be regarded as more than coincidence, and so regarded was circumstantial evidence which strongly fortified the more direct testimony of Indenbaum and Mark Cortell.

7. Other assignments of error are without merit, including that concerning the prosecutor's statement in argument that "in any criminal case . . . a witness should be given credit today for testifying." See *Commonwealth* v. *Clark,* 292 Mass. 409, 411; *Commonwealth* v. *Smith,* 342 Mass. 180, 186–188.

*Judgments affirmed.*