COMMONWEALTH *vs.* JACK DOUGLAS & others.

Suffolk.   March 4, 1968. — May 3, 1968.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, & SPIEGEL, JJ.

*Extortion.   Small Loans.   Statute, Validity.   Constitutional Law, Due process of law.   Eavesdropping.   Evidence, Relevancy and materiality, Hostile witness, Leading question, Redirect examination, Telephone conversation, Acts and declarations of conspirator.   Practice, Criminal, Voir dire.*

G. L. c. 140, § 110, penalizing engaging in a small loans business without a license and defining in specific terms what creates a prima facie violation, and an indictment charging a violation thereof, were not void for vagueness.  [219]

There was no eavesdropping in violation of G. L. c. 272, § 99, where, without court orders but with the consent of the victim of a crime, a detective from the prosecutor's office listened on an extension line in the victim's house to a telephone conversation between him and the defendant, and the victim's lawyer listened to another telephone conversation between him and the defendant by means of a speaker attached to a tape recorder installed by police on the victim's telephone line with his permission.  [220-221]

At the trial of an indictment for violation of G. L. c. 140, § 110, a conversation between a borrower and the defendant, prior to the period mentioned in the indictment and particulars as the period during which the defendant engaged in an illegal small loans business, relating to a loan transaction the execution of which, by the collection and payments of interest and principal, continued well into the period covered by the indictment, was relevant to the defendant's activities during that period and was rightly admitted in evidence.  [223]

There was no error at a criminal trial in permitting the prosecutor to ask leading questions of a hostile witness called by the Commonwealth.  [223-224]

At the trial of indictments for threats to extort, being an accessory before the fact thereto, conspiracy to extort, and violation of G. L. c. 140,

§ 110, there was no error or abuse of discretion on the part of the judge in permitting the victim to testify what was done with respect to crediting to principal or interest payments made by him on a loan to him by a defendant [224]; in refusing to permit the victim to be cross-examined concerning a conversation he had during the trial of the indictments with a witness who claimed his privilege against self-incrimination when subsequently called by a defendant [224–225]; in permitting the victim on redirect examination to testify about what he told his attorney with respect to a matter opened up on cross-examination, even if such testimony incidentally tended to show that the defendants might have committed other offences [225–226]; or in admitting testimony by the victim concerning certain telephone conversations which he had. [226]

It was within the discretion of the judge at the trial of indictments to conduct a voir dire, in the absence of the jury, to ascertain whether inquiry of a witness called by the defendants, who represented that the witness would claim his privilege against self-incrimination, in the presence of the jury would be prejudicial to the defendants or productive of relevant testimony. [225]

At the trial of an indictment for conspiracy to extort, there was sufficient proof of coöperation by all the defendants in pressure on a debtor concerning the collection of loans to him to warrant the admission of evidence of the acts and declarations of one defendant in pursuance of the common object against the other defendants. [226]

At the trial of indictments against two brothers for violation of G. L. c. 140, § 110, evidence warranted findings that the defendants, without licenses, made, or acted with respect to, two illegal loans to a debtor about a year apart, each loan in the amount of $500 with interest at the rate of $25 a week, that such loans were either made or paid within the period mentioned in the indictments and particulars, that the second loan was not a friendly or charitable act, but was entered into for profit, that there was widespread harassment and coercion of the debtor to effect collection of the second loan, and that as to him the defendants were in the business of making small loans in violation of § 110; and there was no error in the judge's refusal to direct verdicts for the defendants. [226–227]

At the trial of indictments for threats to extort, being an accessory before the fact thereto, and conspiracy to extort, direct evidence of threats made by two defendants to a debtor to enforce payment of an unconscionable and illegal loan to him by a third defendant warranted an inference that the threats were made at the behest of the third defendant, by his employees and in his interest, and the evidence as a whole warranted a conclusion that, in exerting the pressures upon the debtor, all three defendants were acting in concert as conspirators to extort; and there was no error in the judge's refusal to direct verdicts for the defendants. [227]

INDICTMENTS found and returned on October 27, 1966, and October 28, 1966.

The cases were tried in the Superior Court before *Forte, J.*

*John P. White, Jr.,* for the defendant O'Neill.

*David S. Nelson* for the defendant Douglas, *Joseph S. Oteri* for the defendant Alexander Celeste, & *Monroe L. Inker* for the defendant Frank Celeste, joined in a brief.

*Murray P. Reiser,* Assistant District Attorney (*Roger Michael Carey,* Legal Assistant to the District Attorney, with him), for the Commonwealth.

CUTTER, J. Douglas, Frank Celeste, Alexander Celeste, and Arthur J. O'Neill were indicted for various offences. Douglas and O'Neill were each charged with threats to extort. Alexander Celeste was charged with being an accessory before the fact to such threats. Frank Celeste and Alexander Celeste were each indicted for violation of G. L. c. 140, § 110, making it a crime for an unlicensed person to conduct a small loan business (see fn. 3). All four defendants were charged with conspiracy to extort. Frank Celeste was found not guilty on the conspiracy indictment, but the other three defendants were found guilty. Each defendant was found guilty of the other offences, listed above, with which he was charged.[1] The cases are before us under G. L. c. 278, §§ 33A–33G, as amended. On somewhat conflicting evidence the facts set out below could have been found. The jury were not required to believe, or to regard as controlling, other evidence, which might tend to reflect adversely on the testimony and the behavior of the Commonwealth's principal witness, Melvin Sacks (as a partner in his insurance firm and as an employee of the Celestes from October, 1965, to August, 1966).

No defendant held a State license to make small loans. See G. L. c. 140, § 96, as amended through St. 1962, c. 795, § 1 (see later amendment by St. 1967, c. 190). In September, 1963, Alexander Celeste lent $500 to Sacks, an insur-

---

[1] The Commonwealth nol prossed certain other indictments tried with these cases. Alexander Celeste was found not guilty on two indictments charging threats to extort, and on an indictment for assault and battery. The transcript states that O'Neill, on the day he was sentenced in these cases, pleaded guilty to certain other indictments on which he also was sentenced. The record does not show these indictments to be related to the present cases.

ance broker. Interest was to be at the rate of $25 a week (equivalent to 260% per annum). Payments were to be made to one or the other of the Celestes. Some of about eight payments of $25 were made to Alexander Celeste. The other payments were made to Frank Celeste at Sacks's place of business. The payments were not applied to the principal of the loan. Early in November, 1963, Sacks paid Alexander the $500 principal.

In November, 1964, Alexander Celeste again lent Sacks $500 on the same terms. Frank Celeste appeared about once a week to collect $25, and thirty-nine payments of $25 were made between November, 1964, and August, 1965 (a total of $975). During the period, O'Neill began to accompany Frank Celeste when he made collections. No payments were made directly to Alexander Celeste. Sacks did not deduct on his 1965 Federal income tax return any interest payments on this loan.

After these thirty-nine payments had been made, at a time when four or five $25 payments were due, Frank Celeste told Sacks to credit the amount to Frank's insurance account with the insurance firm in which Sacks was a partner with Malcolm Post. This credit involved about $175 for insurance premiums due. Sacks made no interest payments on the loan thereafter, at least until September, 1966. Sacks closed or sold his insurance agency and for a time after late August, 1965, was unemployed. In October, 1965 (when Sacks, in accordance with his 1964 arrangement with Alexander Celeste, owed the $500 principal plus four or five interest payments), Sacks was told by Alexander Celeste in Frank Celeste's presence, that he could start working for the Celeste brothers at a used car lot ("New England Auto") in Dorchester. He said that they would "table" the loan, pending a later arrangement for paying it. Sacks worked for eight to ten months for New England Auto, was clerk of the corporation, did bookkeeping for it, and was a stockholder in the concern. Sacks left New England Auto in August, 1966, although he worked to some extent on their books for two months thereafter. There was testimony

indicating disputes between the Celestes and Sacks concerning the latter's sales activities.

On August 24, 1966, Douglas reported to Alexander Celeste by telephone in Sacks's presence that there had been a call from the district attorney's office concerning Sacks. Sacks, at Alexander Celeste's house, told Celeste that the call was about money Sacks had borrowed from another lender. Sacks's testimony was that Celeste then hit him in the face, and kicked him in the stomach. See, however, the verdict that Alexander Celeste was not guilty of assault and battery (fn. 1). On this occasion, Alexander told Sacks "it was a cardinal sin to borrow money from another loan shark while owing one." Alexander also told Sacks that if he "knew what was good for . . . [his] wife and kids," he had better not say anything to anyone from the district attorney's office. On an earlier visit Alexander had shown Sacks two sticks of dynamite, and on this occasion said that he would not "think twice about blowing up" Sacks's house. Sacks also testified that he saw various victims "take a beating" in back of the Celestes' garage.

Sacks in fact had borrowed from one Zine and owed money to one Carbone. The latter, when called as a witness in the absence of the jury, claimed his constitutional privilege not to testify.

On August 25 or 26, 1966, Sacks was told by Douglas that he knew Sacks was leaving the employment of New England Auto, that Sacks "still owed some money, and that . . . [he would] have to make arrangements to pay it." Sacks had a similar talk with Frank Celeste and with Alexander Celeste. He also had a telephoned inquiry from Douglas who "asked . . . what . . . [Sacks] was doing about getting some money" and said, "You better have it. . . . [Y]ou should pay it, if you don't want any trouble." On September 1, Douglas called again and demanded money by the next weekend. On September 8, 1966, Sacks spoke by telephone with O'Neill and Douglas. O'Neill said, "If you don't want to get hurt, you'd better get some money . . . real fast." Douglas said, "[Y]ou are almost at the end of

the road." On September 14, O'Neill told Sacks, "You'd better have some money or you could be put in the hospital for four or five weeks." That day Sacks gave O'Neill $300.

On September 19, Sacks's father withdrew $1,000 from a savings bank and gave Sacks a check for $1,000. Sacks cashed this and paid the proceeds to Douglas. Douglas reported to Sacks that he paid these proceeds to Alexander Celeste. Two days later Douglas asked for the balance. When Sacks replied that he could not get $1,000 "just like that," Douglas said, "When you feel that cold barrel [of a gun] to your head, you'd be surprised how many ways you can think of of coming up with some money." He added, "[Y]our kid must have a long walk . . . from school, and you wouldn't want anything to happen to her knee caps on the way home, would you?" From early in September, Sacks received numerous telephone calls from Douglas substantially every day pressing for payment. Some of these calls were to Sacks's house, but many went to Sacks's new place of employment in Quincy.

In September and early October, Sacks consulted an attorney, Mr. Jordan Ring, a neighbor. Mr. Ring then represented a client who had made an attachment on Sacks's house. Sacks wished to get this attachment removed so that he "could raise the money to pay Al Celeste." It was brought out in part on cross-examination, and expanded in redirect examination, that Sacks told Mr. Ring the story of the threats. He informed Mr. Ring that he had told a detective from the district attorney's office nothing, because he did not "want any harm to come to . . . [his] family and" himself. He informed Mr. Ring that he (Sacks) "would rather pay the money" than go to the district attorney's office in view of the risks. Mr. Ring "insisted that . . . [Sacks] go to the District Attorney's office."

On October 11 or 12, 1966, Douglas went to Sacks's place of employment and renewed his demands. Sacks told Douglas he had no money for him. Douglas replied, "I should bust you right in the face right now, but I am not

going to. I'm going to see what I can do for you but you'd better have some money in the next day or so."

Sacks called Mr. Ring. Two detectives from the district attorney's office visited him on October 11, 12, and 15. With Detective McLean listening on an extension telephone, Sacks "called . . . Douglas back," apparently in response to a message left with Mrs. Sacks by Douglas. Douglas said, "I can get you a few more days. . . . I should have busted you this morning. You're a no-good . . . ." He also told Sacks that he had "better come up with the money."[2]

Sacks gave the police permission to install a tape recorder on his telephone line. On October 17, there was recorded one of many telephone conversations between Sacks and Douglas during this period. In this conversation Douglas made demands for payment. Mr. Ring, Sacks's attorney, heard the conversation, which originated with a call by Sacks, with the aid of a speaker attached to the recorder on which one "can hear what is being taped." He verified the accuracy of the tape, which was received in evidence, after an extended voir dire. Douglas admitted that the recorded voice was his. The machine "was not telephone equipment." It was installed without the participation or consent of the telephone company, without any judicial authorization, and without Douglas's knowledge. The tape recorder gave off no "beeps" which would inform a person on the line that it was operating. The first machine did not work and it was replaced prior to October 17. This, so the detective who installed it testified, was not a "wire tap," be-

---

[2] On October 12, Sacks had a conversation with Douglas about how much he then owed. He quoted Douglas as saying that "he had discussed with Al and Frankie [Celeste] and that they had figured [it] out to be $2,400, but that they would give me a break and make it $2,000." At least the amount of the payments in excess of the $500 originally borrowed by Sacks from Alexander Celeste appears to have been interest, referred to by various witnesses as "vig" or "juice." In the recorded telephone talk of October 17 mentioned in the text, Douglas demanded that Sacks "come up with the vig" and that he "start paying juice." Explanation by Sacks and others of the meaning of these slang expressions was admissible, if judicial notice could not be taken of the meaning. See Crafts v. McCobb, 303 Mass. 172, 175; United States v. Prochaska, 222 F. 2d 1, 2–3 (7th Cir.) cert. den. 350 U. S. 836; People v. Knott, 52 Cal. App. 2d 439, 441–442; Wigmore, Evidence (3d ed.) § 2582.

cause the machine was installed with the permission of Sacks, the telephone subscriber.

On October 17, Sacks paid to Douglas five $10 marked bills. Sacks was then wearing an electronic device. No tape was procured, however, because the device did not function. On that day the Celeste brothers, O'Neill, and Douglas were arrested.

1. The Celeste brothers contend that G. L. c. 140, § 110, as amended through St. 1962, c. 795, § 2[3] (see later amendment, St. 1967, c. 196, increasing the penalties), is void for vagueness and that the two indictments, charging them with violations of § 110, should have been dismissed because they failed to inform them with sufficient clarity of the offence charged. We perceive no such infirmity in the section or in the indictments.

The Legislature may prohibit and make criminal the unlicensed granting of small loans. It may recognize "the danger that such a business . . . [may] be conducted oppressively" and the desirability of furnishing a "degree of protection to [small] borrowers." *Dewey* v. *Richardson*, 206 Mass. 430, 432. *Goodowsky* v. *Rubenstein*, 225 Mass. 448, 450–451 ("The statute [as it stood prior to St. 1913, c. 347, § 2] does not prohibit all such loans except by licensed persons," but "forbids the making of such loans as a business unless one is licensed. The making of a single loan might be sufficient . . . [in] appropriate circumstances to warrant a finding that the one making the loan was carrying

[3] Section 110 as in force in 1963 and 1964, reads: "Whoever, not being duly licensed as provided in . . . [§ 96] on his own account or on account of any other person not so licensed, engages in or carries on, directly or indirectly . . . the business of making loans . . . to which . . . [§§ 96–111] inclusive, apply, shall be punished by a fine of not more than . . . [$5,000] or by imprisonment for not more than two years, or both. Any loan made . . . by an unlicensed person in violation of said sections shall be void. [A] In any judicial proceedings under said sections the fact that the defendant has made or assisted in the making of two or more loans of three thousand dollars or less, upon which there has directly or indirectly been paid or charged, for interest . . . or other expenses, a sum which exceeds in the aggregate an amount equivalent to twelve per cent per annum upon the amount actually received by the borrower, whether such sum has been paid to or charged by the defendant or . . . any other person, shall be prima facie evidence that the defendant has engaged in and carried on the business of making loans to which" §§ 96–112 apply. The letter in brackets has been inserted for convenient reference to the sentence following it.

on the business. But it does not require such a finding"). See *Commonwealth* v. *Silverman*, 220 Mass. 552, 554–555. The section, taken with other sections to which it refers, is adequate "to convey to a person of ordinary understanding . . . [a] description of the prohibited act." See *Jaquith* v. *Commonwealth*, 331 Mass. 439, 442. All rational presumptions are to be made in favor of its validity. See *Commonwealth* v. *Finnigan*, 326 Mass. 378, 379. There is in § 110 no such vagueness as was considered in *Alegata* v. *Commonwealth*, 353 Mass. 287, 296–297, 299–301, but see pp. 303–304. The final sentence of § 110 (see fn. 3, at point [A]) in specific terms defines what is sufficient to create a prima facie case of violation by apt reference to at least one set of facts having a rational tendency to show the conduct of a business. Provisions of this type are valid. See *Meunier's Case*, 319 Mass. 421, 425–426. See also *Commonwealth* v. *Williams*, 6 Gray, 1, 4–8; *Commonwealth* v. *Spindel*, 351 Mass. 673, 676–678. Proof of two small loans within a reasonable period of time, at a rate of more than twelve per cent per annum, supports the conclusion that the lender was in the business of making such loans. Loans made to friends, or as a matter of charity, are not often effected upon such terms or in such circumstances.

2. The defendants argue various exceptions concerning the evidence received of telephone conversations between Sacks and Douglas. Detective McLean, on an extension line in Sacks's house, listened to one or more such conversations. Mr. Ring (with the aid of a speaker attached to a tape recorder) listened to another. This latter talk, with Sacks's permission, was recorded on a tape. There was no violation of G. L. c. 272, § 99 (as amended by St. 1959, c. 449, § 1),[4] which creates the crime of eavesdropping.

---

[4] Section 99 reads, in part: "Whoever, except in accordance with an order issued as provided herein, secretly *or without the consent of either a sender or receiver*, overhears or attempts secretly, or without the consent of either a sender or receiver, to overhear . . . or permit, or to have any other person secretly, or without the consent of either a sender or receiver, to overhear any spoken words at any place by using any electronic recording device, or a wireless tap or electronic tap, or however otherwise described, or any similar device or arrangement, or by tapping any wire to intercept telephone com-

Section 99 is supplemented by § 101. Each conversation was overheard with the consent of Sacks, "a sender or receiver" within § 99 (fn. 4). Section 101 (as amended by St. 1956, c. 48, § 4),[5] merely makes certain conduct prima facie evidence of violation of § 99, but there is no violation where a sender or receiver has given consent to that conduct. The case thus is unlike *Commonwealth* v. *Spindel*, 351 Mass. 673, 675, where "[t]here was no evidence that . . . [any person participating in the conversation] consented to . . . monitoring." We need not consider whether the tape recorder was a "device" which Sacks, as owner of his house and "on premises under his exclusive control" (see § 101, fn. 5), could install and use in any event. See the *Spindel* case, 351 Mass. 673, 677.

In *Rathbun* v. *United States*, 355 U. S. 107, 109–111, there was found no interception of the type then and now forbidden by 47 U. S. C. § 605 (1964). The court approved the admission in evidence of conversations overheard by police on a regularly used extension telephone with the consent of the telephone subscriber, a party to the conversation. A defendant who speaks incriminating words over the telephone runs the risk that the person with whom he talks may be an informer (see *Hoffa* v. *United States*, 385 U. S. 293, 302–303) or that the conversation (as in the *Rathbun* case) may be overheard on an extension telephone. In the interests of sound law enforcement, in these days when telephone talks often supplant face to face encounters, he also should be held to take the risk that his words may be

munications, shall be guilty of the crime of eavesdropping and shall be punished by imprisonment . . . or by a fine . . . or both" (emphasis supplied). The remaining provisions of § 99, dealing with the issuing of judicial orders for use of various devices, need not now be considered. No such order was issued.

[5] Section 101 reads, in part: "Proof of the installation in any building of any device or arrangement which may be used for the purpose of violating the provisions of . . . [§ 99] by listening to any spoken words or proof of the tapping of any wire, *unless duly authorized* and *unless done with the consent of the owner or person in control of the building*, shall be prima facie evidence of the commission of the crime of eavesdropping; but nothing contained in this section or . . . [§§ 99 and 100] shall render it unlawful for any person to install and use such a device on premises *under his exclusive control*" (emphasis supplied).

recorded by his listener. See *Lopez* v. *United States*, 373 U. S. 427, 437–440 (tape admissible of a personal interview during which a bribe was attempted). In the present case there was, of course, no such prior judicial authorization of the use of a recording device as in fact took place in *Osborn* v. *United States*, 385 U. S. 323, 327–331. There was no occasion in the *Osborn* case for the Supreme Court of the United States to consider again the broad issue presented and decided in favor of admissibility in the *Lopez* decision, 373 U. S. 427, 437–440. There was no reason for such prior approval. The present case was not one of surreptitious placing of a recording device in another's office (see *Berger* v. *New York*, 388 U. S. 41, 44–45), or in a position enabling third persons to overhear, without the consent of any party to the telephone conversation, a private call made from a public telephone booth. See *Katz* v. *United States*, 389 U. S. 347, 354–359.

In the case at bar, there was at most a recording of telephoned threats, themselves constituting the commission of a crime, made to the victim of the crime and of continued unlawful harassment. The victim, himself a participant in the conversation, consented to the recording. He was sitting in his own house, at his own telephone, with his own attorney listening to the conversation. If it be relevant (see *Lewis* v. *United States*, 385 U. S. 206, 210–212), Sacks was not an informer committing a breach of confidence, and could be found to have been a victim of extortion. See *Dryden* v. *United States*, 391 F. 2d 214 (5th Cir. — recorder on extension telephone). Cf. *United States* v. *White*, 36 U. S. L. Week 2613 (7th Cir. — electronic device on informer),* a case which seems inconsistent with the Supreme Court decisions already cited.

No illegal search or other violation of any constitutional or statutory provision made the recording inadmissible. See *Glacy* v. *United States*, 361 F. 2d 31, 35–36 (1st Cir.), cert.

---

* The opinion in this case, originally announced on March 18, 1968, by a three judge panel, was superseded by an en banc opinion announced on January 7, 1969, 405 F. 2d 838. REPORTER.

den. 385 U. S. 831; *Harris* v. *United States*, 367 F. 2d 633, 635 (1st. Cir.), cert. den. 386 U. S. 915. Any other conclusion, we think, would give members of the underworld carte blanche to intimidate (or otherwise to engage in criminal conduct injurious to) innocent members of the public over the telephone, without risk that their words could be overheard or recorded (even with the consent of the victims) in a manner which would be used against the offenders in a court. See *Schwartz* v. *Texas*, 344 U. S. 199, 203; *Pugach* v. *Dollinger*, 277 F. 2d 739 (2d Cir.) affd. 365 U. S. 458; *United States ex rel Griffin* v. *Hendrick*, 360 F. 2d 614 (3d Cir.). Cf. *Nardone* v. *United States*, 302 U. S. 379, 382–385; 308 U. S. 338, 340–341; *United States* v. *Dote*, 371 F. 2d 176, 180–181 (7th Cir.).

3. There is no merit in the defendants' contention that the judge improperly received evidence of (a) a September, 1963, conversation[6] between Sacks and Alexander Celeste occurring prior to the period (October 15, 1963 to October 18, 1965) mentioned in the indictment as explained by particulars, and (b) a loan transaction which took place in part before that period.

As to Alexander Celeste, the conversation in September, 1963, related to a loan transaction the execution of which, by the collection and payments of interest and principal, continued well into the period covered by the indictment, and shed light on Celeste's activities during the period, including payments on the 1963 loan and the making and collection of the later loan. The evidence was relevant. See *Commonwealth* v. *Stasiun*, 349 Mass. 38, 46–47. Cf. *Commonwealth* v. *Runge*, 231 Mass. 598, 600.

The somewhat ambiguous evidence of Edwin Small concerning a 1966 loan to him by Alexander Celeste, at most

---

[6] The jury were told that the conversation was admitted only against Alexander Celeste. In any event, verdicts of not guilty were directed on indictments charging O'Neill and Douglas with violations of G. L. c. 140, § 110. The Commonwealth nol prossed indictments charging them with conspiracy to violate § 110. Even if we were to assume that they have standing to argue the admissibility of this evidence, they were not harmed by it, for the evidence as to them would have been relevant substantially only with respect to those indictments.

tended to explain other activities of Alexander Celeste within the indictment period, if, indeed, the evidence was sufficiently definite or comprehensible to have any probative effect whatsoever. There was ample indication that Small was a hostile witness. It was not error to permit the prosecution (which had called him) to ask him leading questions. *Commonwealth* v. *Monahan*, 349 Mass. 139, 162–163. *Commonwealth* v. *Soroko*, 353 Mass. 254, 260.

4. Similarly without merit is the contention that Sacks was not competent to testify concerning what was done (in crediting payments to principal or interest) with the payments made on the 1963 loan. Sacks, as the debtor under that arrangement, could reasonably conclude (where weekly payments remained constant at $25 a week, and were followed by a single payment of the $500 amount of the original loan) that the earlier payments had been applied as interest. Sacks's conclusions were consistent with the terms of the agreement imposed on him by Alexander Celeste.

5. The judge did not abuse his discretion when he refused to permit Sacks to be cross-examined concerning a conversation with Orlando J. Carbone, a witness later called by Douglas. The conversation had taken place in January, 1967, during the trial of these cases. The judge, as the evidence then stood, reasonably regarded this inquiry as irrelevant to the issues raised in the indictments. At a bench conference, the judge excluded the line of questions until such time as some other evidence showed the inquiry to be relevant.[7] The assistant district attorney stated that he would produce Sacks for further cross-examination on a day's notice, if evidence later showed the inquiry to be relevant, and not merely to relate to a collateral matter.

When Carbone later took the stand, it was represented to the judge that the witness would claim his privilege not to testify because of the possibility of self-incrimination.

---

[7] Douglas, the only defendant to take the stand, later testified in effect that he had interceded with Carbone in behalf of Sacks in order to persuade him not to press Sacks for payment of a loan made by Carbone and that he had only pressed Sacks to pay Alexander Celeste $200 owed by Sacks. The jury, of course, was not required to believe this testimony.

The judge conducted a voir dire, in the absence of the jury, and, except in answering questions concerning his name, address, and employment, Carbone claimed his privilege. Douglas's counsel then said, "I submit that there would be no further purpose in inquiring of the witness." An exception claimed prior to the voir dire (to the judge's statement that he would not let the witness identify himself and claim his privilege in the presence of the jury until he heard the voir dire) was not renewed by the defendants after the voir dire. It was within the judge's discretion to hold a voir dire to ascertain whether inquiry in the presence of the jury would be prejudicial to the defendants or productive of relevant testimony. No objection or exception to what the judge did intelligibly raised the issue (see *Commonwealth* v. *Baker,* 348 Mass. 60, 63; cf. *Murphy* v. *Commonwealth, ante,* 81, 83–84) whether the witness was being afforded too broad a protection based upon his privilege.

6. Sacks's testimony on redirect examination about what he told his attorney, Mr. Ring, was with respect to a matter opened up on cross-examination by inquiry about (a) what Sacks had told the attorney, and (b) what he had or had not told to the district attorney and to certain police officers when he had opportunity to talk to them. There may have been some indication that the defendants were claiming Sacks's story to be recently contrived. See *Commonwealth* v. *Heffernan,* 350 Mass. 48, 51–52. In any event, this testimony on redirect examination was reasonably permitted by the trial judge, as matter of discretion, in explanation of Sacks's testimony on cross-examination about (a) his failure to make more prompt reports concerning the threats to the district attorney and to the police, and (b) his conversation with Mr. Ring. See *Commonwealth* v. *Galvin,* 310 Mass. 733, 747. See also *Commonwealth* v. *Binkiewicz,* 342 Mass. 740, 758; *Commonwealth* v. *Gardner,* 350 Mass. 664, 668–669.

It is irrelevant that this testimony incidentally tended to show that the defendants may have committed other offences, e.g. by intimidating other persons. The testimony was pertinent in that it tended to explain fears which led to Sacks's

failure to report to the authorities the threats made to him and his delay in letting Mr. Ring do so. All this became of significance because of matters brought out on cross-examination. See *Commonwealth* v. *Feci*, 235 Mass. 562, 567; *Commonwealth* v. *Gettigan*, 252 Mass. 450, 459–460. Similar principles apply to cross-examination (permitted within the judge's discretion) of a witness (Post) concerning an assault upon him by O'Neill, in an effort to test Post's credibility by showing that he feared O'Neill. This was not a case where the prosecution sought to introduce, through a witness called by it, evidence of other crimes to prove commission of the particular crimes charged. Cf. *Commonwealth* v. *Stone*, 321 Mass. 471, 473; *Commonwealth* v. *Welcome*, 348 Mass. 68, 70–71.

7. The defendants contend that testimony by Sacks concerning certain telephone conversations was admitted without prior proof that Sacks was able to identify the voice of the speaker. Objections were made and exceptions saved but without pointing out to the trial judge that the identification of the voice was the ground of any exception. There was no specific objection (see *Irving* v. *Goodimate Co.* 320 Mass. 454, 460) based on the issues discussed in *Bond Pharmacy, Inc.* v. *Cambridge*, 338 Mass. 488, 490–491, and *Chartrand* v. *Registrar of Motor Vehicles*, 345 Mass. 321, 325. Sacks testified that he had received a call from Douglas. This reasonably implied that he recognized the latter's voice.

The conversations were relevant. There was also sufficient proof of coöperation by all the defendants in pressure on Sacks concerning the collection of the loans to him to warrant the judge's preliminary conclusion that there was a prima facie case of conspiracy permitting evidence of the acts and declarations of one conspirator in pursuance of the common object to be admitted against the others. See *Commonwealth* v. *Stasiun*, 349 Mass. 38, 50–51, and the cases there reviewed.

8. There was ample evidence from which it could be found that the Celestes made, or acted with respect to, two loans in violation of G. L. c. 140, § 110, which were either made

or paid within the period mentioned in the indictments and particulars. The evidence, as a whole, showed that the second loan to Sacks in November, 1964, was not a friendly or charitable act, but entered into for profit. Taken with the earlier loan, on the same terms, which was not paid until November, 1963, and with the testimony of widespread harassment and coercion to effect collection of the second loan, the evidence warranted the jury in concluding that (as to Sacks, at least) the Celestes were in the business of making such loans.

There was direct evidence of Douglas's and O'Neill's threats made to Sacks to enforce payment of the unconscionable and illegal 1964 loan. It could be reasonably inferred that the threats were made at the behest of Alexander Celeste, by his employees and in his interest. The evidence already summarized permitted the jury to conclude that, in exerting the pressures upon Sacks, all the defendants were acting in concert as conspirators to extort.

There was no error in refusing to direct verdicts for the defendants.

9. Other assignments of error already have been covered adequately or do not merit discussion.

*Judgments affirmed.*