## COMMONWEALTH
## v.
## Francis THORPE

### No. 79-388

Superior Court Department
Trial Court of the
Commonwealth of Massachusetts

Counsel of Record
John Bonistalli, Attorney General, Plaintiff
Thomas Troy, Defendant

## MEMORANDUM OF DECISION ON DEFENDANT'S MOTION TO SUPPRESS

The defendant was indicted in February, 1979, under General Laws Chapter 268A, Section 2(a) (2), charging that "on or about October 6, 1978, and. . .(to) November 6, 1978. . .(he did) corruptly give, offer and promise something of value to a municipal employee with intent to influence such an employee to commit and aid in committing and collude in, and allow a fraud, and make opportunity for the commission of a fraud on the Commonwealth and State, and county and municipal agency."

From conferences with the assistant attorney general in charge of the case and his opening at the hearing, it appears to the Court that the Commonwealth expects to prove that the defendant, a former police officer retired on a disability, had access to answers to questions in an examination to be given to police officers seeking promotion to sergeant and offered the same to Wilmington Police Officer David McCue for a price of $4,000.

On October 4, 1979, defendant filed his motion to suppress:

"1. The contents of each and every interception of wire or oral communications of the defendant, specifically, but not limited to any and all interceptions of wire or oral communications between the defendant and one David McCue," and

"2. Any and all evidence derived from the contents of each and every interception of wire or oral communication of defendant."

The motion was based on (1) General Laws Chapter 272, Section 99, (2) the Fourth and Fourteenth Amendments to the United States Constitution, (3) Article XIV of the Declaration of Rights of the Commonwealth of Massachusetts, and (4) 18 U.S.C. Section 2518.

The Court heard testimony and argument and received briefs. It makes the following:

### FINDINGS OF FACT

1. A town-manager form of government was established for the Town of Wilmington by Acts 1950, c. 592. Chapter 592 has the force of a town charter. See Mass. Const., Art. of Amend., Art. II, Sec. 9. Section 12 of c. 592 provides in substance that the town manager should have the power and duty to supervise and direct the administration of all departments, commissions, boards and offices, except selectmen, school committee, moderator, members of the Wilmington Housing Authority, board of appeals, election officers, registrars of voters, the town clerk, constables, town counsel and town accountant. He has the authority to appoint and remove, subject to the provisions of Chapter 31 of the General Laws, the Chief of Police and police officers.

2. David McCue was appointed a full time, permanent police officer of the town of Wilmington on July 15, 1973.

3. In 1970 McCue had become acquainted with the defendant.

4. The Court infers that for some time prior to October 6, 1978, McCue was interested in being promoted to sergeant and had been studying hard for the October 21, 1978 examination.

5. On October 6, 1978, at about 2:45 p.m., McCue, then at his home in Wilmington, received a call from defendant, whose voice he recognized. The defendant told him that he understood that McCue was studying

for the sergeant's exam and that he, defendant, had available, through an organization headed by a woman, the exam (including, I infer, the answers) which he would sell to McCue for $4,000. Defendant said that he would meet McCue at the Wilmington Ford Agency premises on October 10, 1978.

6. McCue, within minutes after the telephone conversation, conferred with the Town Manager, Sterling Morris, who called Town Counsel, Allan Altman, and the three met at Altman's office at about 3:15 p.m.

7. A decision was made to report the matter to Steven Delinsky of the Attorney General's office. The chain of command at the Attorney General's office with respect to State Troopers was as follows: Steven Delinsky was at the apex; directly below him were Assistant Attorneys General Robert Greco and John Bonistalli; below them and regularly attached to the Attorney General's office was Sergeant John Joyce, and below him Troopers Robert Cummings, Robert Zepf, Francis O'Brien, Joseph Flaherty and John McDonough. In a different line, assigned to special matters, were State Police Captain Peter Agnes, and below him Detective Lieutenant Joseph Denehy.

8. Morris and Altman reported the matter to Delinsky, who in turn reported the matter to Peter Agnes, who in turn conferred with Joseph Denehy. Thereafter, at the Attorney General's office there was a conference of Delinsky, Greco, Agnes and Denehy. Sergeant Jack Joyce was put in charge of the matter and conferred with Trooper Robert Zepf, I infer as to the most efficient manner in which to collect evidence of the defendant's illegal activity. A cooperative plan was evolved to record conversations.

9. On Sunday, October 8, 1978, at about 6:30 p.m., McCue and Morris went to Altman's office where they conferred with Joe Denehy, Joyce, Assistant Attorney General Bob Greco and Assistant Attorney General John Bonistalli, at which time it was suggested that McCue keep his date with defendant on October 10, and I infer plans were made to record conversations with defendant.

At 9:00 p.m. that day, McCue, at Altman's office, met with Assistant Attorney General Steve Delinsky and Denehy. McCue asked Delinsky if he and his family could receive some protection or new identity if he exposed the facts that he had. He was told that everything possible would be done but that he, as a police officer, had to set a good example of disclosure of criminal activity. McCue agreed. Further plans were made for recording any conversations with defendant on October 10.

10. After the conference, Morris was of the view that Officer McCue, as part of his regular duties for the Town of Wilmington, would work with the Attorney General and the State Troopers associated with that office.

At no time did McCue discuss his conversations with defendant with the Chief of the Wilmington Police Department. I infer that as a result of McCue's conferences he was asked to cooperate and work with the Attorney General's office, and they with him, in an attempt to obtain evidence of illegal activity by defendant. McCue subjectively believed that he was working with the Attorney General with the direction and approval of Morris whom he considered his superior.

On Monday, October 9, 1978, Morris told the then Chief of the Wilmington Police Department, Paul Lynch, of the assignment of McCue to work with the Attorney General.

11. On October 9, at the premises of Sweetheart Plastics in Wilmington (where, I infer, he was on a detail) McCue met with Zepf, Joyce, and Denehy, and possibly also an Assistant Attorney General. During this meeting,

Zepf, who had special training and experience in intercepting devices, equipped McCue with and explained the operation of a "Kel Kit," a short range (100 yards - 1/4 mile), low power (200-250 milliwatt), small (1/2" x 1-1/2" x 2-1/4") radio transmitter with a wire antenna attached, designed to transmit to a receiver (the size of a small briefcase) to be operated by Zepf out of sight and by him recorded on a tape recorder. Zepf made such a recording three or four times a year.

12. On October 10, 1978, at about 7:00 a.m., McCue went to the Wilmington Ford premises to keep his date with defendant and waited until about noon but defendant did not appear.

At about 12:30, McCue, at a DeMoulas Market nearby, conferred with Assistant Attorney General John Bonistalli about the possibility of obtaining a search warrant for any physical material (such as exams or answers) which might be revealed. Joyce and Zepf were also present. I infer that during this meeting a plan was devised whereby McCue would talk with defendant on the telephone and arrangements would be made to record such conversations. Zepf gave McCue equipment necessary for such recording, consisting of a tape recorder and a suction cup with which to attach an induction microphone to the receiving end of a telephone.

13. On Thursday, October 12, 1978, McCue called defendant from Zepf's office in the Attorney General's building having gotten the telephone number, 324-0939, from a state trooper. Also present at some time was Zepf, Joyce and Denehy. Robert Cummings and Assistant Attorney General William Linehan may also have been present for part of the time. This conversation was recorded, Exhibit 1 and 1A. During the conversation, McCue pretended to bargain for a lower price, but defendant said he would have to get back to "her" (the female, heading up the organization). Thorpe indicated that time was of the essence. Thorpe also indicated that the misappropriation of exams was an ongoing operation, that he also had to check with one John," and that the "ball game" was normally offered to only one person in each city or town.

14. At about 8:05 a.m. on October 13, 1978, McCue, while at his home in Wilmington, had another telephone conversation with defendant. This was similarly recorded, Exhibit 2 and 2A, and during it Thorpe urged complete secrecy, told McCue that he could not get a perfect score on the test but had to "blow a couple of them," but that this would be arranged in advance.

15. On October 18, 1978, three efforts were made to record telephone conversations from the Attorney General's office, but each was unsuccessful. These efforts were by a different technique. A Mark 4 telephone starter was attached to the terminals corresponding to the telephone in the Attorney General's "tack room" (where electronic equipment was stored) in series with a tape recorder. The telephone starter was to transform the power from the telephone line sufficient for clear recording. A recorded message from defendant's end was the only thing received, Exhibit 3 and 3A.

16. At 9:21 p.m. on October 19, McCue, while at his home in Wilmington, had another conversation with defendant which was recorded, Exhibit 4 and 4A. In that conversation, defendant indicated he still had not heard from his superiors in the organization and urged McCue to be patient.

17. On October 20, about midday, McCue met with Zepf and Joyce at Sweetheart Plastics. Later, McCue, from his home in Wilmington, made three recorded telephone calls to defendant, Exhibits 5, 6, 7, and 5A, 6A and 7A. A date was made to meet at the Ground Round in North Andover. At

2:15 p.m. at the Ground Round in Andover, McCue used the Kel Kit to record a 1-2 minute conversation with defendant. The recording was of poor quality. The gist of the conversation was that defendant wanted McCue to take a ride with him in order to go to a safer place. McCue declined, saying that he would see the defendant later. One of the reasons that McCue declined to go elsewhere with defendant was that he was unarmed and knew that defendant was always armed. After McCue and defendant parted, Joyce observed defendant make a 15-20 minute telephone call from a pay station.

At 4:43 p.m., McCue called defendant from his home but a different person answered. At 5:05 p.m., defendant called McCue and the conversation was recorded, during which defendant said there would be 80 questions on the exam, three involving diagrams. At 6:20 p.m., McCue called defendant from his home but got an answering service message, Exhibit 7 and 7A. At 8:51 p.m., from his home, McCue called defendant and made a recording, Exhibit 7 and 7A, of poor quality. The gist of the conversation was as follows: McCue sought another meeting, defendant said he had to confer with his people, McCue indicated his understanding that he would see the examination before the two of them went for a ride, but defendant said he did not have the examination but would show him the answer sheet as a sign of good faith. At 9:45 p.m., from his home, McCue called defendant but got no answer. At 10:04, the same. At 10:05, defendant called McCue at his home and the two arranged to meet that night at Dunkin Donuts in Lawrence. McCue then travelled to the Andover barracks where he was equipped with the Kel Kit and $4,000. He then travelled to the Dunkin Donuts in Lawrence where he conferred with defendant and recorded the conversation, Exhibit 8 and 8A, which was as follows: McCue asked for the answers; defendant did not have them; McCue offered the $4,000; defendant declined until they went to a safer place; McCue declined to go anywhere, and defendant broke off negotiations. At about 11 p.m. defendant was seen by Joyce making a 20-30 minute telephone call from a pay station. In their conversation, defendant referred to "the committee. . .originated by this broad."

18. The sergeant's exam was given on October 21, 1978 and, as predicted, contained 80 questions, three involving diagrams.

19. McCue never prepared any written reports but reported orally to Morris. He was paid throughout by the Wilmington Police Department, including some overtime. He received no compensation from the Attorney General's office.

20. I infer that those involved in the theft and sale of the answers to the sergeant's exams were a tightly knit group with considerable security and discipline.

21. McCue authorized the State Police to record all the conversations that he conducted and which were transmitted by the Kel Kit, and also all those which were recorded at the Attorney General's office by the State Troopers.

22. The standard procedure of the Attorney General and police for court ordered wiretaps is different from that used here. In such cases, the telephone company is enlisted to advise where there are "appearance points" (i.e. where the wires can be plugged into), the police select the most convenient location, and the telephone company builds a leased line to a rented site where the police conduct monitoring. The telephone company is paid for their assistance.

23. On November 6, 1978, at 2:45 p.m. at the Attorney General's office with Assistant Attorney General Linehan and Robert Cummings, McCue had

another telephone conversation with Thorpe which was recorded, Exhibit 9, discussing an article in the **Boston Herald** concerning an alleged sale of the state exam, referring particularly to the October 21 police exam.

## DISCUSSION

Defendants seek to suppress both the tapes (Exhibits 1-9) and any testimony by Officer McCue pertaining to their contents, all pursuant to sub-section "P" of General Laws Chapter 272, Section 99, which provides that "any person who is a defendant in a criminal trial in a court of the Commonwealth may move to suppress the contents of any intercepted wire or oral communication or evidence derived therefrom for the following reasons. . ." The definition sub-section B-5 defines "contents,. .when used with respect to any wire or oral communication, (as) any information concerning the identity of the parties to such communication or the existence, contents, substance, purport or meaning of that communication."

### 1. Federal Constitution

Defendants claim that the recordings violated the Federal Constitution. It is clear that that position is unsound. See United States v. White, 401 U.S. 745, 749 (1971); United States v. Jones, 545 F.2d 1112, 1114 (8th Cir. 1976); Hoffa v. United States, 385 U.S. 293, 302 (1966); See also Flemmi v. Gunter, 410 F. Supp. 1361, 1368 (D. Mass. 1976); and compare Commonwealth v. Look, Mass. Adv. Sh. (1980) 537, 550, n. 9 (holding that if the recording satisfies the State Statute it also satisfies the Fourth Amendment to the United States Constitution.)

### 2. Massachusetts Constitution

Defendant claims that the recordings violate the State Constitution. He offers no cases in support. The position is unsound. Under the pre-1968 law, it was clear that where there was one party consent, the recording was not unconstitutional under either the Federal or State Constitution. See Commonwealth v. Douglas, 354 Mass. 212, 222 (1968). See also Flemmi v. Gunter, supra at 1368, f.7. In District Attorney for the Plymouth Dist. v. N.E. Tel. & Tel. Co., Mass.Adv.Sh. (1980) 197, the dissenting justice suggested that a recording might constitute a search if there were no probable cause. However, here it is clear that Officer McCue had probable cause.

### 3. Federal Statute

Defendant claims that the recordings violated the Federal Statute. Nothing could be clearer than that they do not. A one-party consent, by a policeman or a citizen, is permissible under the Federal Statute. See 18 U.S.C., Sec. 2511(2) )c) and (d). See also U.S. v. White, supra; U.S. v. Gladney, 563 F.2d 491, 493 (1st Cir. 1977); and particularly U.S. v. Horton, 601 F.2d 319, 320 (7th Cir. 1979), where the facts are very similar.

Defendant argues that normal investigative procedures must have been tried and have failed or reasonably appear unlikely to succeed, see 18 U.S.C., sec. 2518(1) (c), before a legal wiretap may be made. However, it is clear that this requirement only applies where a wiretap warrant is sought. See Commonwealth v. Vitello, 367 Mass. 224, 259 (1975) and 18 U.S.C., sec. 2518(1) (c).

### 4. State Statute

A. Defendant's Arguments-- Defendant attacks the recordings on the theory that McCue was not a "law enforcement officer" who had "power of arrest" the defendant in all of the locations where he and the defendant were located when the recordings were made. He would appear to concede, however, that McCue had such authority with respect to the several recordings made at his home in Wilmington on October 6, 13, 19 and 20, 1978.

Defendant further argues that there is

no showing that Officer McCue or the Attorney General were investigating "designated offenses" in connection with organized crime as organized crime is defined in the preamble since there was no evidence of employment of brutal and violent tactics, nor infiltrating legitimate business activities and depriving honest businessmen of their right to make a living. Defendant also suggests that federal cases defining organized crime as requiring five or more participants should be read into the statute. Defendant claims that **Vitello** incorporated into the State Statute the federal requirement of "exhaustion"* of normal investigatory techniques, see 18 U.S.C. 2518(1) (c), even in the warrantless situation.

B. Commonwealth's Arguments--The Commonwealth argues that McCue was a police officer, had the power of arrest generally, and the statute should be so construed. Alternatively, the Commonwealth argues that the State Troopers and the Attorney General had powers of arrest throughout the state and had been authorized by McCue to record the communications. They, in turn, did the recording with McCue's assistance by supplying him with the suction microphone and the Kel Kit.

The Commonwealth also argues that the only definition that should be carried from the preamble into the Section B-7 is that requiring evidence of a conspiracy among groups who engaged in supplying illegal goods and services. Finally, the Commonwealth argues that the "exhaustion" provisions of both the State and Federal Statutes pertain only to warrants.

C. Decision--The Court finds the Commonwealth's arguments more persuasive. The definition of "interception" in Section B-4 provides that ". . .it shall not constitute an interception for an investigative or law enforcement officer, as defined in this section, to record or transmit a wire or oral communication **if the officer is a party** to such communication **or has been given prior authorization** to record or transmit the communication **by such a party. . ."** (emphasis added).

Sub-section B, paragraph 8, defines "investigative or law enforcement officer" as "any officer of. . .a state or a political sub-division of a state, who is empowered by law to conduct investigations of or to make arrests for, the designated offenses, and any attorney authorized by law to participate in the prosecution of such offenses."

The term "designated offense" is defined in sub-section B, paragraph 7, to "include the following offenses in connection with organized crime as defined in the preamble. . .bribery. . ."

Statutes must be interpreted by giving their words ordinary meaning and resolving any ambiguities in such a fashion as to make the statute a meaningful, workable whole capable of implementing its obvious purpose. See **eg. Bd. of Ed. v. Assessor of Worcester,** 368 Mass. 511 (1975); **Beloin v. Bullett,** 310 Mass. 206 (1941).

McCue was clearly an officer of a political sub-division of the state and had authority to conduct investigations and to make arrests for bribery. To read into the statute the additional requirement that he had such authority in all of the locations where he and defendant were located during the communications would make the statute unworkable.

In any event, even if McCue is not an investigative or law enforcement officer within G.L. c. 272, sec. 99, the tapes need not be suppressed because the Assistant Attorneys General and the State Police officers involved in the case are such investigative or law enforcement officers. The Attorney General has broad powers to investigate all violations of law; see G.L. c. 12, sec. 10, **Comm. v. Kozlowsky,** 238 Mass. 379, 388 (1921); and to appoint assistant attorneys general as needed,

see G.L. c. 12, sec. 2 and such assistants as are necessary to carry out his investigatory powers, see G.L. c. 12, sec. 10 **Comm. v. Koslowsky, supra** at 384. State Police officers have the powers of police officers, including the authority to arrest and participate in a prosecution of bribery, and may exercise those powers throughout the state. See G.L. c. 147, sec. 2.

The obvious policy behind the statutory scheme is that such law enforcement officers are sufficiently reliable that they should be permitted to record when they are parties to the communication or have been given authorization by such parties. The broad distinction to be kept in mind is between the recording of a conversation in which one party is consenting, on the one hand, and eavesdropping on conversations of two other people, neither of whom consent, on the other. If the Court is wrong in the above analysis, it would still appear that the Kel Kit transmissions would be admissible since they were recorded exclusively by State Troopers working with and for the Attorney General.

Also, in contrast to **United States v. White, supra,** decided under the Federal Statute, which held that even if the tapes were suppressed, the witness could testify from memory, the statute Section "P" seems to be more restrictive in suppressing the "contents" of communications. However, the definition refers to both oral and wire communications, and "oral communication" is defined in Section B-2 as speech except such speech as is transmitted over public airways by radio or other similar devices. The Kel Kit transmissions were so transmitted.

The recordings not made by McCue while in Wilmington were made by State Troopers or Assistant Attorneys General who had been given prior authorization to make then by McCue, a party to the conversation. Since the State Troopers and Assistant Attorneys General are investigative or law enforcement officers, these recordings, too, come within the statutory exception to "interception" so long as the investigation concerned a "designated offense."

An offense, such as bribery, in connection with organized crime as defined in the preamble is a designated offense. The preamble provides that "(o)rganized crime, as it exists in the Commonwealth today, consists of a continuing conspiracy among highly organized and disciplined groups to engage in supplying illegal goods and services. In supplying these goods and services, organized crime commits unlawful acts and employs brutal and violent tactics. Organized crime is infiltrating legitimate business activities and depriving honest businessmen of the right to make a living."

All of this lengthy description of organized crime could surely not have been intended to be carried into the definition of designated offense. It is clear from that that the preamble intentionally limits the application of the statute to certain criminal investigations. However, the statute would be totally unworkable if, in every case, the Commonwealth was required to prove that the activities constituted "a grave danger to the public welfare and safety," that they were performed by "highly organized and disciplined groups," that "brutal and violent tactics" were employed and that "legitimate business activities" were being infiltrated.

The Court is of the opinion that that portion of the preamble intended to be carried into the definition of designated offense is that which refers to a "continuing conspiracy among. . .groups to engage in supplying illegal goods and services." To require more would defeat the purpose of the statute, which was enacted precisely because organized crime is so difficult to uncover and prove. See G.L. c. 272,

sec. 99, Preamble.

A conspiracy is complete on the agreement of two or more persons to commit an illegal act. See Comm. v. David, 335 Mass. 686 (1957). The evidence indicates that there was such a conspiracy. There was also evidence that it was continuing. If necessary, it was also well organized and disciplined. The Court finds that this part of the statute has been satisfied.

There is no merit to defendant's "exhaustion" argument, since that requirement relates only to the warrant procedure. See Commonwealth v. Vitello, supra at 259.

### RULING

The defendant's Motion is consequently DENIED.

By the Court.
Robert J. Hallisey
Justice of the Superior Court